### IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| REDBIRD BUSINESS GROUP, LLC;<br>REDBIRD BIOSCIENCE OKLAHOMA,<br>LLC; and RB REALTYCO, LLC,<br><br>      Plaintiffs and<br>      Counter-Defendants,<br><br>v.<br><br>MATTHEW HARRISON,<br><br>      Defendant and<br>      Counter-Claimant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. CIV-20-098-JAR<br>)<br>)<br>)<br>)<br>) |

## OPINION AND ORDER

This action and the claims asserted by each side in it stems from an employment agreement between Redbird Business Group, LLC, Redbird Bioscience Oklahoma, LLC, and RB Realtyco, LLC (collectively referred to hereinafter as "Redbird") and Matthew Harrison ("Harrison") and the representations or misrepresentations arising both before and after the agreement was signed.

Beginning on July 11, 2022 and continuing through July 14, 2022, this Court conducted a non-jury bench trial with regard to the outstanding issues in dispute in this action. After the presentation of evidence, the parties were afforded the opportunity to file proposed findings of fact and conclusions of law, which were submitted in a timely manner in September of 2022.

This Court has considered all of the evidence presented by way of live testimony, depositions, exhibits and stipulations as well as the parties' proposed findings and conclusions in the formulation of this Order.  After said consideration, this Court hereby enters the following findings of fact and conclusions of law in conformity with Fed. R. Civ. P. 52:

## FINDINGS OF FACT

1.   Redbird was a venture founded in 2018 by William Thurman ("Thurman") and Dr. Nimesh Patel ("Patel"), a medical doctor. (Tr. 59: 16-17; 340: 9-10). Redbird operates a medical marijuana growing and sales facility in Stillwell, Oklahoma.  (Tr. 64: 24-25).  The Oklahoma license to sell medical marijuana is held by Mariteq LLC.  (Tr. 65: 1-7).  Mariteq LLC is wholly owned by Thurman.   Redbird Bioscience Oklahoma, LLC is a professional service company providing high-level consultants that have particular expertise in different matters to the Mariteq entities. (Tr. 424: 8-15).  RB RealtyCo, LLC owns the real property located in Stillwell, Oklahoma used in the operation of the business. (Tr. 65: 8-10, 17-19).  Redbird Business Group, LLC is a holding company, owning a majority interest in the units of RB RealtyCo and Redbird Bioscience.  (Tr. 422: 18-25; 423: 1-2). In turn, Redbird Ventures, LLC is a manager of Redbird Business Group, LLC, holding a controlling interest in that entity.  (Tr. 423: 4-10).

Thurman owns 50% of the units of Redbird Ventures through BTX7 Holdings, Inc. and Patel owns 50% of the units of Redbird Ventures through DK&S, LLC. (Tr. 423: 11-15).

2. Thurman founded Redbird. (Tr. 340: 9-10). Thurman is the decisionmaker or manager of Redbird. (Tr. 341: 18-19). Feedback is provided to Thurman through a board of managers comprised of five or six individuals. (Tr. 342: 6-8). However, decision making to commit any of the Redbird entities lies with Thurman. (Tr. 342: 9-13). Thurman makes the day-to-day business decisions for the Redbird entities. (Tr. 342: 14-18). He exercises "autocratic control" and makes all the decisions for Redbird. (Tr. 181: 17-23).

3. Bill Brewer ("Brewer") with Brewer Attorneys & Counselors ("BAC") is an attorney who previously represented Thurman in a dispute in a business venture. Thurman considered Brewer a close friend and trusted him as an advisor and lawyer. (Tr. 63:9-18). Brewer was one of the larger shareholders in Redbird, having been granted shares without a cash contribution with Thurman and Patel. (Tr. 68: 14-18). Brewer held the shares or units through a Delaware LLC, BCM, LLC. (PreTrial Order, p. 5, Fact No. 27).

4. On August 21, 2018, Thurman and Mariteq, LLC entered into an engagement agreement with BAC (the "BAC Agreement") "to formally

retain the firm to provide public affairs and general advisory services" to the Redbird venture. (Def. Exh. No. 1; Pl. Exh. No. 8).

5.   Harrison began working for BAC in New York City, New York in 2008 after graduating from Boston University with a Bachelor of Science in Management. (PreTrial Order, p. 4, Fact No. 16).  He was employed from August of 2008 until May or June of 2011. (PreTrial Order, p. 4, Fact No. 17).  Harrison then attended New York University Stern School of Business from 2011 until he graduated in 2013 with a master's degree in Business Administration. (PreTrial Order, p. 5, Fact No. 21).  After graduating, Harrison returned to BAC as a Consultant in August 2013. (PreTrial Order, p. 5, Fact No. 22).  Between August 2013 and January 31, 2020, Harrison was an employee of BAC.  He worked as a consultant delivering BAC's services to Redbird pursuant to the BAC Agreement from when he was assigned in 2018 until late-January 2020.  (PreTrial Order, p. 5, Fact Nos. 23, 26). Harrison, who eventually attained the title of as the Director of Consulting at BAC, was assigned by Brewer to provide advisory and business consulting services to Redbird pursuant to the BAC Agreement, including helping Redbird with their public relations, working with Redbird's outside public relations firm, arranging

meetings with supply companies and potential investors, assisting Redbird staff with financial modeling and analysis, advising on strategic business decisions and preparing investor presentations. (PreTrial Order p. 4, Fact No. 8).

6.   Brewer introduced Harrison to Thurman.   (Tr. 74: 1-2). Brewer described Harrison as one of the "top young people in his firm" and spoke of his close relationship with Harrison's family, including his father, Tom Harrison.   (Tr. 74:16-25; 75:1).

7.   Thurman was told by Brewer that Harrison "would be, . . ., his conduit, his liaison, . . . he would be the man that he put in place to work with us on his behalf, to help us, advise us, and assist us not only in our communication back to Bill Brewer and as he tried to stay what we call "line of sight" -- good line of sight on everything and that he would -- he had a lot of great qualities and capabilities to assist us as we tried to develop this business."   (Tr. 76:22-25; 77:1-4).

8.   Thurman acknowledged that both he and Brewer were very busy and Harrison acted as a "go between".   As Thurman explained, "by having a talented individual that -- that sits between us, it makes it efficient for us to communicate and -- bidirectionally and to keep line of sight and everybody's finger on the pulse of what's going on."   (Tr. 78:1-11).   This alleviated the need for Thurman

to speak directly to Brewer.  (Tr. 78:12-17).

9.   Thurman considered Harrison to be "talented" and that they "worked well together."  (Tr. 78:22-23).

10.  Once Harrison was assigned to Redbird, he was considered by Thurman to be "a senior advisor, really, pursuant to his role at Brewer.  He was in advising me on any -- anything I needed to, if I needed to communicate or -- we were looking for talent and capital.  Those were our two priorities, and -- and he dove in. . . . he wasn't in Oklahoma, so, . . ., I didn't have him there on sight daily, but I'd call him and, you know, go through the challenges in trying to find capital and talent, and he was there to help us and. . . ."  Harrison remained officed in New York while providing services for Redbird.  (Tr. 79:11-20).

11.  Thurman and Redbird were constantly looking for "capital and talent" since the cannabis business they strove to begin required considerable capital infusion and talent was difficult to attract or "pretty thin" since the new industry was previously associated with criminality.  (Tr. 79:25; 80:1-24).  Although Thurman ran Redbird, he and Patel assumed they could recruit individuals from larger companies to operate the business but this turned out to be a "bad assumption" as there was "no talent pool" from which to draw. (Tr. 80:25; 81:1-20).

6

12.  In the Spring of 2019, Thurman began looking for executive staff to assume some of the day-to-day operations of Redbird and expressed that need to Harrison to get his help.  (Tr. 90:1-18). Conversations turned to Harrison possibly taking a "leadership role" in Redbird.  (Tr. 91:8-25; 92:1-21).

13.  Less formal discussions became more formal when Thurman and Harrison began discussing Harrison assuming a role as chief operating officer ("COO").  Thurman informed Harrison that the COO job would be "awful" because "[i]t's a fist in the boot, and all roads lead to you."  (Tr. 94:7-17).  Nevertheless, Harrison continued to express interest in full-time employment with Redbird.  (Tr. 94:18-21).

14.  Thurman testified that he believed at first that Harrison was an attorney with BAC.  As such, he stated that it was "[Brewer's] table" and "that, you know, I'm not going to be perceived to be recruiting out of Bill's firm; and that, whatever we do, you know, Bill is going to have to bless this."  (Tr. 95:2-7).  Thurman stated Harrison responded, "Of course."  (Tr. 96:6-8).  Thurman believed that the "intrinsic rules" of business would require the Brewer be informed of Harrison's discussions to take over as COO at Redbird.  (Tr. 98:7-23).

15.  Thurman and Patel discussed Harrison assuming the role of COO

and determined to make a formal offer to him.  Patel e-mailed Harrison to state, among other things, "We are also considering all board meetings to be held [in Dallas at Brewer's offices] and subsequently would love for you to take an active roll as a COO as we expand market share not only across Oklahoma but other states as well.  Let us know your availability tomorrow for a conference call between Bill, myself and you."  (Pl. Exh No. 55).

16.  Thurman stated that he believed Brewer had been informed of the content of the e-mail including Harrison's anticipated role and the plan to use Brewer's offices in Dallas from which to operate Redbird. (Tr. 105:25; 106:1-17).  Thurman testified that he learned, however, in late January of 2020 that Harrison had not communicated this information to Brewer.  (Tr. 106:18-25; 107:1-5).

17.  For his part, Harrison told Redbird's representatives, including Thurman, that he would not tell Brewer or BAC about the employment with Redbird until he had final signed agreements for him to assume the CEO position because of the tenuous nature of Redbird's business.  (Tr. 594:6-13; 595:23-25,596:1-17; 597:11-13; 598:24-25, 599:1-17).  It was not clear to Harrison that Redbird would be in a financial position to hire a full time CEO. (Tr. 594:18-24).  Harrison wanted to have agreements finalized

and "everything buttoned up" before resigning his position with BAC.  (Tr. 596:5-15).  He requested several provisions in the Agreement to insure he was compensated in the event Redbird's business failed before he resigned his position with BAC.  (Tr. 604:14-607:12).  Thurman testified that Redbird was in a dire financial position because traditional banking lending was not available to businesses engaged in cannabis.  (Tr. 127:17-25, 128:1-11).

18.  Discussions continued with Harrison into June of 2019 concerning his assumption of a leadership role at Redbird, except he proposed that he be named chief executive officer ("CEO") rather than COO.  (Tr. 108:17-21).  Negotiations continued between Harrison, Patel, and Joe Byars ("Byars"), general counsel for Redbird concerning Harrison's employment with Redbird.  (Tr. 113:17-23).

19.  Harrison introduced his father, Tom Harrison, to Thurman. Thurman knew Tom Harrison had connections in the cannabis industry, including with Merida Capital, a provider of capital to cannabis businesses.  (Tr. 116:7-22).  Thurman spoke with Tom Harrison on the telephone and they briefly touched upon Harrison becoming CEO of Redbird. (Tr. 116:23-25; 117:1-2).  They discussed Harrison taking a leadership role with Redbird. (Tr. 117:3-22).  They also

discussed Merida Capital's potential investment in Redbird.  (Tr. 117:23-25; 118:1-13).   Later, Thurman met with Harrison and Tom Harrison for dinner and they discussed Harrison's leadership role with Redbird.  Thurman and Patel had traveled to New York to meet with Brewer and investment banks.  Thurman testified Harrison told him Brewer was unavailable and suggested this was an untruth, unbeknownst to him at the time.  (Tr. 133:2-135:16).

20.  Among Merida's portfolio companies was a digital marketing and media firm known as MediaJel.  Harrison urged Redbird to cancel its contract with its current company Studio Flight in favor of a contract with MediaJel.  Redbird contracted with MediaJel and cancelled its contract with Studio Flight.  (Pl. Exh. No. 158, 192, 197).  Redbird later cancelled the contract with MediaJel, not due to the quality of their work but the poor value of their work because they were such an expensive firm.  (Weinstein Depo. 117:18-23).

21.  In July of 2019, Harrison requested that Redbird use his personal g-mail address as opposed to his BAC firm e-mail address for any communication related to his potential employment as CEO. (Def. Exh. No. 11).  He specifically e-mailed Thurman and Byars from his personal e-mail account, stating "[p]lease just use this e-mail address for anything involving redbird employment

agreements." Id. Despite Thurman's dismissal of his frequent use of e-mails, he did in fact recognize Harrison's personal g-mail address and its use by the Board of Redbird. (Pl. Exh. No. 116; see e.g. Def. Exh. Nos. 51. Harrison testified that Thurman switched the e-mail address which he used to communicate with him. (Tr. 632:21-25). Thurman acknowledged the possibility he did so. (Tr. 286:22-287:4).

22. On August 9, 2019, Harrison e-mailed Thurman regarding the employment agreement that they were negotiating for Harrison to become Redbird's CEO. He wrote, "[c]an you sign on behalf of RB then send/scan to me for signature? I might need to move my start date back a few days so I can give Brewer the full 2 weeks notice period. Does that work for you?" (Def. Exh. No. 12). Thurman responded stating, "No problem, I'll get it done this evening." Id.

23. On August 8, 2019, Harrison spoke with Thurman and Patel by phone about finalizing the employment agreement. (Tr. 599:5-17). Harrison told Thurman and Patel, "I would like to get this done so that I can finally tell Brewer." (Tr. 599:7-10). Thurman responded, "That's good. I don't want to operate in the shadows much longer." (Tr. 599:11-12). Harrison understood this statement to mean that they knew they were not bringing the

Harrison's employment with Redbird to the attention of Brewer or BAC until the documents were finalized.   (Tr. 599:13-17; 600:1-14).

24. On August 9, 2019, Harrison and Redbird finalized the employment agreement but did not agree on the unit grant agreements.   (Pl. Exh. Nos. 106, 108).   On August 13, 2019, Harrison sent a text message to Thurman stating, "I sent over revisions to the share grant agreement, as we discussed.   Can we get [Byars] to knock it out today?   Brewer is finally back in the office and I'd like to button everything up before I formally resign.   Start date is still 8/26, so that's not moving."   (Def. Exh. No. 15).   Harrison also e-mailed Byars about the status of his unit grant agreements, stating, "I'd like to finalized this last piece so I can formally resign."   (Def. Exh. No. 25).

25. In August of 2019, Redbird's board was considering deferring Harrison's start date and was reviewing the unit agreements. During the call with Harrison, board member Michael Butler asked Harrison if he had told Brewer that he was leaving to join Redbird, and Harrison told them he had not told them.   Harrison testified Butler stated, "Good, because if we end up postponing your start date, you won't be out of a job."   (Tr. 600:25-601:4).

26. Harrison also testified that when Redbird's financial

statements were being circulated, the drafts included Harrison's position as CEO and his compensation.   When asked whether the statements should be sent to Harrison's BAC e-mail address, Thurman responded, "Good God, no.   That's got his information in there.   Send it to his g-mail."  (Tr. 601:17-19).

27.  Harrison repeatedly reminded Byars to send communications related to his employment agreement and unit grant agreements to his g-mail address.  (Tr. Def. Exh. Nos. 27, 28, 173; Tr. 597:15-598:23).

28.  In January of 2020, Harrison also expressed concern Thurman would refer to him as a "will be CEO" in front of investment bankers from Dallas meeting Harrison and Thurman at a facility in Stillwell, Oklahoma.   He asked Thurman to refrain from the reference stating, "Please don't make any comment about me becoming the CEO.  I know these bankers are from Dallas.  They may know Bill Brewer.  I just don't want any issue with that."  (Tr. 602:22-25).   Thurman responded, "I got it.   Nothing to worry about." (Tr. 602:1-2).

29.  In communications with Redbird's new Chief Operating Officer, Stacy Wright ("Wright"), Harrison testified that he informed Wright that he was not telling anyone at the Brewer firm he was leaving until the agreements were finalized.   (Tr. 603:9-23).

13

Wright acknowledged that he had done the same with his employer. (Tr. 603:20-23).  In a text message, Wright stated, "How are things going on your exit?  Stealth mode?" to which Harrison responded, "I gave my resignation notice on Thursday."  Wright responded, "Oh s***.  How did Bill take it?  Brewer."  Harrison stated, "A little surprised, but overall seemed happy for the opportunity

30.  A formal employment agreement for Harrison to become CEO of Redbird dated January 15, 2020 was signed by all parties, including Harrison and Patel and Thurman for Redbird Bioscience Oklahoma, LLC, Redbird Business Group, LLC, RB Realty Co, LLC and Redbird Ventures, LLC.  (the "Agreement") (Pl. Exh. No. 1).  The Agreement provides that Redbird Bioscience Oklahoma, LLC "desires to employ [Harrison] as Chief Executive Officer, and [Harrison] desires to accept such employment" with a start date of February 3, 2020 and a term of three years to February 3, 2023.  By its terms, the Agreement is governed by the laws of the State of New York.

31.  The Agreement provides the following:

> Superseding Agreement.  This Agreement
> constitutes the entire agreement between the
> parties and contains all the agreements
> between them with respect to the subject
> matter hereof.  It also supersedes any and all
> other agreements or contracts, either oral or
> written, between the parties with respect to
> the subject matter hereof.
>
> (Pl. Exh. No. 1, ¶15).

32. The Agreement also contains a warranty clause, which provides:

> 12. Representation and Warranty. Executive represents and warrants that he is not a party to any non-compete, restrictive covenant or related contractual limitation that would interfere with or hinder his ability to undertake the obligations and expectations of employment with the Company.

> (Pl. Exh. No. 1, ¶12).

33. Harrison also entered into a Restricted Unit Grant Agreements ("RUGA") with Redbird Bioscience Oklahoma, LLC (Pl. Exh. No. 2); Redbird Business Group, LLC (Pl. Exh. No. 3); and RB RealtyCo, LLC (Pl. Exh. No. 4). The RUGAs provided for the granting of varying numbers of Profit Units to Harrison in each entity, estimating the fair market value of each grant. Id.

34. Each RUGA contains an "Entire Agreement" clause which provides:

> This Agreement, including any Exhibits and Schedules attached hereto, together with any agreements referred to herein and any consulting, employment, confidentiality and/or restrictive covenant agreement(s) entered into between the Grantee and the Company or any Affiliate of the Company, contain the entire agreement among the parties hereto with respect to the Company and supersede all prior agreements, covenants, arrangements, letters, communications, representations or warranties, whether oral or written, by any party hereto with respect to

the Company or its business. No party shall be
bound by any condition, definition, warranty
or representation, unless and only to the
extent (i) expressly set forth or provided for
in this Agreement or in any other agreement
entered into by a party on or subsequent to
the date hereof, set forth in writing and
signed by the party to be bound thereby, or
(ii) this Agreement (including the Exhibits
and Schedules hereto), or such other
agreements, are amended pursuant to their
terms.  This Agreement expressly supersedes
and bars extra contractual statements and
promises of any kind.

(Pl. Exh. No. 2, 3 and 4 § 7.7).

35.  The Agreement and the RUGAs were finalized fully executed on

January 22, 2020 with Redbird's board approving the same.  (Tr.

561:18-562:10).  Thurman testified that he never read any of the

agreements.  (Tr. 129:21-23).  When asked why he did not instruct

Byars to include a provision in the agreements for Brewer to be

informed of Harrison's employment, Thurman stated,

I don't -- I didn't even interact. Why would
I care? I assumed it was already a known fact.
Why -- that would have been presumed that I
questioned or doubted Mr. Brewer's appointment
of Mr. Harrison and the whole construct that
we existed in.  I did not doubt it or be --
or it -- was not concerned with it at all. I
had -- honestly, when I look back at some of
this stuff, and I see where the -- our board
members and Michael Butler -- this was
distributed to relatively small figures within
our company. Michael Butler played a small
advisory role to the board. I don't -- I don't
look at who all's on these email threads. I'm
busy. I assumed Brewer was on there or in --

16

> somewhere through Matt Harrison -- that Bill
> Brewer would certainly have line of sight when
> all of -- when Joe is calling Nimesh and Dr.
> Hird and all the board members together to
> review this, that -- that certainly would rise
> to the occasion that Bill Brewer would have
> specific exposure to that.

(Tr. 121:18-122:10).

36. At all times relevant to the facts of this action, Thurman and Byars were able to contact Brewer about their intent to engage Harrison as the CEO of Redbird. (Tr. 60:10-14; 61:19-63:18; 427:14-428:18). Thurman stated that, in hindsight, he "should have" called Brewer about the employment of Harrison by Redbird, but "it really wasn't front and center for me." (Tr. 281:14-23). Byars could have contacted Brewer to determine if he was aware of Harrison's employment with Redbird. (Tr. 555:19-556:10). He speaks directly with Brewer every two months about Redbird without using any "conduit." (Tr. 550:1-16; 555:19-556:10).

37. On January 23, 2020, Harrison met with Brewer in person at BAC's office in New York to resign from his position from the firm. (Tr. 607:13-16). In the meeting, Harrison told Brewer about the CEO position at Redbird. (Tr. 607:17-19). In response, Brewer said that is sounded like a good opportunity, giving credit to Thurman for spotting the opportunity, telling Harrison, "We've had a really good run." (Tr. 608:6-12).

38.   Harrison texted Thurman to tell him he spoke with Brewer.
(Tr. 608:13-25).  Harrison wrote, "I just spoke with brewer.  He's
happy for me and the opportunity.  He gave you credit for spotting
the opportunity and sticking with it because it sounds like it's
at a really great place and ready to take off."  Id.; Def. Exh.
No. 18).  Thurman and Harrison spoke soon thereafter, with Thurman
expressing that he was relieved that Brewer was happy with
Harrison's opportunity with Redbird.  (Tr. 151:18-19).

39.  On January 24, 2020, Brewer tried to call Thurman but spoke
with Byars.  Byars texted Thurman and stated that he received a
call from Brewer who "wants to know what's going on."  (Pl. Exh.
No. 193).  He texted that "it appears Matt had not spoken with
him, and he indicated that he would have wanted a call from you
about a job offer to Matt."  Id.  Thurman responded with an
indecipherable expletive laden expression of displeasure.  Id.

40.  On January 27, 2020, Harrison spoke with Byars and Thurman.
Byars told Harrision "that he had received a call from Bill Brewer
on Friday, that Bill Brewer was upset that I was joining Redbird,
and that he was trying to get in touch with Bill Thurman so that
he could stop it from happening."  (Tr. 617:4-9).  Thurman told
Harrison "that he had just spoken with Bill Brewer, that Bill
Brewer wanted to hit the pause button on me joining Redbird."

18

(Tr. 617:10-14).

41. On January 28, 2020, Brewer told Thurman that he wanted to meet with him in New York. Thurman called Patel, told him to cancel his clinic, and that they had an emergency to meet with Brewer in New York. (Tr. 400:6-24).

42. On January 29, 2020, Thurman and Patel met with Brewer in Brewer's offices. Harrison was surprised to see them and greeted them in a conference room. Brewer ordered Harrison out of the room. (Tr. 618:8-13).

43. Thurman and Patel met with Brewer. Brewer told them he was shocked that they offered Harrison a job and he was not informed of it. (Tr. 403:18-21). He also stated that Harrison's contracts were not theirs to deal with. (Tr. 243:7-12). Brewer told them he would deal with Harrison and determine what was to be done next. (Tr. 243:13-15).

44. After the meeting with Brewer, Thurman and Patel met Harrison on the sidewalk down the street from Brewer's office. (PreTrial Order Fact No. 45). Harrison recorded the conversation. (Def. Exh. No. 20). Thurman told Harrison about the meeting with Brewer and that he was upset that they did not tell him about the CEO position earlier. Id. Thurman said he tried to give Brewer "context" for why they did not tell Brewer about the CEO position

19

earlier.  He explained to Brewer that "this thing was hour-by-hour" and it was only in the last six weeks that they started to see the "light at the end of the tunnel."  <u>Id</u>.

45.  Thurman told Brewer that "Matt has been very effective and been wonderful to work with," "the higher level side of this with the public relations to grow the branding . . . intellectual side of it  . . . has been cultivated very, very thoughtfully and nicely, " and "we are in a positions to take full advantage of it."  <u>Id</u>.  Thurman also stated, "we're happy working with you, that you've done great work, that this public relations, all of the panache and national branding design that we need to lift up out of the clouds, that you are exceptional at it.  And we've had nothing but good time working together."  <u>Id</u>.  Patel stated that they told Brewer, "Matt's been great working with and we realize what he's done for us."  <u>Id</u>.

46.  Thurman encouraged Harrison to "mend fences" with Brewer. Thurman hoped they could move forward with Harrison as CEO or some other working arrangement with "possibly to things working out for everybody."  (Tr. 241:5-8).  Thurman stated that he would keep the conversation between the three of them.  (Def. Exh. No. 20).

47.  On January 30, 2020, Byers e-mailed Harrison a letter entitled, "Rescission/Withdrawal of Employment Agreement and

Restricted Unit Agreements." (PreTrial Order Fact No. 46). The letter stated, "Given the circumstances which have come to light over the past few days, the management team has determined that it is not in the best interests of Redbird to proceed with plans for your prospective employment." (PreTrial Order Fact No. 47). Redbird did not seek board approval from its board before sending this letter to Harrison. (Bintliff Depo. 58:5-9). Harrison responded to the letter the next day through counsel, rejected the attempted recission, and asked Redbird to provide the basis for the recission. (Def. Exh. No. 31). On February 5, 2020, Redbird responded that the agreements were obtained through "fraudulent and dishonest conduct" without identifying the basis for the fraud allegation. (Def. Exh. No. 32).

48. On February 12, 2020, Redbird filed this action for declaratory judgment in the District Court in and for Adair County, Oklahoma. The action was removed to this Court on April 2, 2020. Redbird asserts claims for (1) a declaratory judgment that the Agreement and RUGAs were procured by Harrison's fraud and are, therefore, null and void; (2) a declaratory judgment the Agreement and RUGAs were properly rescinded because Harrison breached the warranty contained in the agreements that he was not under a contractual limitation which would prevent his employment with

Redbird; and (3) unspecified damages.   (Third Amended Complaint filed September 11, 2020 (Docket Entry #27)).

49.   Harrison answered and asserted counterclaims for (1) breach of contract; (2) breach of good faith and fair dealing; (3) promissory estoppel; and (4) breach of guaranty.   (Amended Counterclaim filed September 25, 2020 (Docket Entry #29)).

## CONCLUSIONS OF LAW

A.   Redbird Bioscience Oklahoma, LLC is an Oklahoma Limited Liability Company organized under the laws of the State of Oklahoma with its principal place of business is in Adair County, Oklahoma. It employs the managers of Redbird's business.   RB RealtyCo, LLC is an Oklahoma Limited Liability Company organized under the laws of the State of Oklahoma, and its principal place of business is in Adair County, Oklahoma.   Redbird Business Group LLC is a Delaware Limited Liability Company that is authorized to do business within the State of Oklahoma.   At the time this action was filed, Matthew Harrison was a resident of the State of New York.   Complete diversity of citizenship exists between the parties.   The amount in controversy is in excess of $75,000.00 exclusive of interest and costs.

B.   The parties indicated in the Joint Status Report filed August 28, 2020 (Docket Entry #22) that they did not seek a jury

trial of the disputed issues in this case.  Plaintiff reserved the right to request a jury trial in the same Report but never exercised that reservation.

C.  The parties filed signed consent forms indicating that they consented to the jurisdiction of the undersigned United States Magistrate Judge to preside over this case to final judgment, including the non-jury bench trial of the case.  28 U.S.C. § 636(c)(1).  United States District Judge Ronald A. White to whom this case was assigned when the consents were submitted to the Clerk of the Court executed and entered an Order of Consent to Proceed Before a Magistrate Judge on June 14, 2022 (Docket Entry #137), reassigning the case to the undersigned.  This Court possesses the appropriate jurisdiction over the parties and subject matter of this action, which is based in diversity jurisdiction.  18 U.S.C. § 1332(a)(1).  Further, venue is proper in this District.  28 U.S.C. § 1391(b).

D.  Any finding of fact which is more appropriately described as a conclusion of law shall stand as such.  Similarly, any conclusion of law which might be considered as a finding of fact will be so deemed.

E.  Under New York law which governs the agreements at issue in this case, Redbird which asserts a fraud in the inducement

23

claim[1] must prove that (1) Harrison made a misrepresentation or a material omission of fact; (2) which was false and known to be false by Harrison; (3) which was made for the purpose of inducing Redbird to rely upon it; (4) justifiable reliance of Redbird on the misrepresentation or material omission; and (5) injury.  Hogan Willig, PLLC v. Kahn, 44 N.Y.S.3d 321, 323–24 (App. Div. 2016) quoting Pasternack v. Laboratory Corp. of Am. Holdings, 27 N.Y.3d 817, 827 (Ct. App. 2016), *rearg. denied* 28 N.Y.3d 956.  "In addition to the elements for fraudulent inducement, a cause of action for fraudulent concealment also requires a duty on the part of the defendant to disclose material information and the failure to do so."  Id. citing Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 178 (Ct. App. 2011).

Redbird bears the burden of proving each of the elements of its fraud in the inducement claim by clear and convincing evidence. Hidden Pond Schodack, LLC v. Hidden Pond Homes, Inc., 138 N.Y.S.3d 215, 219 (App. Div. 2020).  "The clear and convincing evidence standard requires the party bearing the burden of proof to 'adduce evidence that makes it highly probable that what he or she claims is what actually happened.'"  Currie v. McTague, 921 N.Y.S.2d 364,

---

1 While the relief sought by Redbird is one for a declaratory judgment, it must prove the elements of the underlying claims which allegedly justifies the declaration.

366 (App. Div. 2011) quoting Krol v. Eckman, 681 N.Y.S.2d 885 (App. Div. 1998).

F.   Upon a thorough review of the evidence and the reasonable inferences drawn therefrom, this Court concludes that Redbird did not meet this high burden of proving its fraud claim.  It is not clear that Harrison misrepresented to Redbird, generally, and Thurman, Patel, and Byars, specifically, that he would advise Brewer of his negotiations, potential employment with Redbird, or realized employment with Redbird.  The mix of communications indicating that Thurman, in particular, as well as Byars during the employment contract negotiations with Harrison as reflected in the Findings of Fact above knew or certainly had strong indications that Harrison was not informing Brewer of his employment opportunity with Redbird.  Thurman, Patel, and Byars testimony that keeping Brewer advised was a precursor or a condition of Harrison's employment represents an attempt to remedy an after-the-fact realization brought about by Brewer's unexpected and surprising adverse reaction to Harrison's employment by Redbird after Harrison's resignation.  Several facts stand out to this Court as persuasive on this issue – (1) if prior notification of Redbird's offer to Harrison was such an essential term, it confounds reason that the term would not have been expressly stated

25

in either the Agreement or a prior writing, signed by all parties. Redbird's insistence otherwise is expressly rejected.; (2) if prior notification was a condition precedent to Harrison's employment, the close relationship and communications between Thurman or Byars with Brewer would have surely caused the matter to be raised during the months of negotiations for Harrison's employment; (3) none of the numerous communications between Harrison and one of the principals for Redbird expressly told Harrison that Brewer must be informed before any contract can be negotiated and signed; and (5) Harrison's position that he could not leave his job at BAC without having the documents finalized for his employment with Redbird and, therefore, he could not inform Brewer of his intent to resign is credible on its face.  No intent to defraud Redbird can be ascertained with clear and convincing evidence from this position.  While Redbird insists that the requirement for Brewer's "blessing" did not need to be expressly put in a document or discussed further by the parties because it was a known fact, it is apparent from the dispute represented here and the evidence presented at trial that this was not the case. "Vague and indefinite" statements cannot form the basis of a fraud claim.  Van Kleeck v. Hammond, 811 N.Y.S.2d 452, 454-55 (App. Div. 2006).

G.   A duty to speak can arise when a fiduciary relationship exists between the parties or when one party has superior knowledge over the other.  Redbird contends that Harrison owed it a duty to disclose that he had not informed Brewer of the employment negotiations with it.  "A fiduciary relationship only arises when one has reposed trust and confidence in the integrity and fidelity of another who thereby gains influence or assumes control and responsibility."  Laikin v. Vaid, 2001 WL 1682873, at *2 (N.Y. Sup. Ct. Oct. 10, 2001) citing Board of Managers of Fairways at North Hills Condominium v. Fairway at North Hills, 603 N.Y.S.2d 867 (Sup. Ct. 1993).  Harrison was an employee of BAC providing consulting services for Redbird.  While Thurman and others at Redbird appeared to consider Harrison quite capable and intelligent, nothing but a typical services type agreement between BAC and Redbird existed.  Harrison was merely a contractor working with Redbird.  The employment relationship between Harrison and Redbird was the very subject matter of this dispute and the approval of someone outside of that relationship was allegedly required by Redbird before Harrison could act on the employment opportunity.  Such a relationship cannot be characterized as fiduciary.

H.   A duty can also arise when one party has superior

knowledge than the other, not readily available to the other, which creates disparate bargaining power because one is acting on the basis of mistaken knowledge.  Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat. Ass'n, 731 F.2d 112, 123 (2d Cir. 1984). Such is not the case here.  Redbird and its principals could have readily informed Brewer of the negotiations with Harrison at any time.  They were on an equal knowledge footing with Harrison.  No duty arose from any superior knowledge.

For similar reasons, the remaining elements for fraud have not been proved.   Harrison did not make any false statement for the purpose of inducing Redbird to rely upon it.  Any ostensible reliance upon Harrison having informed Brewer was not justifiable because it was readily verifiable with Brewer.  Moreover, Redbird's position that an agency relationship existed between Harrison and BAC upon which it could rely to believe Brewer had been informed is nonsensical having previously argued that a fiduciary relationship existed between Harrison and Redbird.  AS an alternative theory, the agency allegation also fails as Redbird had a duty to determine if Harrison was actually acting on behalf of BAC in the transaction with him.  Hefferman v. Marine Midland Bank, 701 N.Y.S.2d 4, 5-6 (App. Div. 1999).  Redbird failed to do so.

Having failed to prove the required elements under the heightened standard of clear and convincing evidence, Redbird's fraud claim, and its associated request for declaratory judgment, fails.[2]

I.  Redbird also asserts a claim for breach of warranty which relates to Paragraph 12 of the Agreement.  This claim has no merit. Harrison was an employee at will with BAC with no contract and was not subject to any of the referenced non-compete type restrictions. Any attempt to impose a duty of disclosure of Harrison's exploration of Redbird's employment through the "related contractual limitation" language in paragraph 12 is unavailing. Indeed, this is part of the problem with the foundation of Redbird's claim – the contract between Harrison and Redbird did not contain any requirement of disclosure to Brewer.  As a result, this Court finds that the restrictions contained in paragraph 12 have no application to the allegations in this case.

J.  Redbird also clings to New York common law for a duty of loyalty that Harrison owed BAC or Brewer.  If such a duty did exist, it is questionable whether Redbird has the requisite standing to assert it.  But, even if it was able to enforce this

---

2 To the extent Redbird also alleges Harrison committed fraud in the transaction involving Merida Capital and MediaJel, the contention is specifically rejected as having no support in the facts, relying upon supposition and speculation as to the parties' motivations.

duty, New York law would not have precluded Harrison from exploring employment with Redbird.  *See* Abraham Zion Corp. v. Lebow, 593 F.Supp. 551, 571 (S.D.N.Y. 1984).  Redbird's breach of warranty and associate request for declaratory judgment fails.

K.  This Court now turns to Harrison's counterclaims.  In order to prevail on his claim for breach of contract, Harrison must demonstrate by a preponderance of the evidence that (1) a contract exists; (2) Harrison performed in accordance with the contract; (3) Redbird breached its contractual obligations.  34-06 73, LLC v. Seneca Ins. Co., 39 N.Y.3d 44, 52 (Ct. App. 2022). In this case, the Agreement and RUGAs were signed by all parties. Harrison resigned his position with BAC and was ready, willing, and able to begin work as Redbird's CEO.  Redbird, in turn, breached the Agreement and RUGAs by rescinding the agreements and declining to allow Harrison to take office on January 30, 2020. Harrison rejected the attempt to rescind and stated that he intended to take over as CEO by letter dated January 31, 2020.  On February 5, 2020, Redbird confirmed that it would rescind the agreements and Harrison did not have employment.  Clearly, Redbird breached the Agreement and the RUGAs.

L.  Harrison's damages for breach of an employment contract under New York law "are measured, *prima facie,* by the wages that

30

would have been paid during the remainder of the contract term." Rebh v. Lake George Ventures Inc., 660 N.Y.S.2d 901, 902 (App. Div. 1997).  Harrison contends that he is due the salary and severance he would have received if Redbird had terminated the agreement without cause on sixty days' notice on Harrison's start date.  (Pl. Exh. No. 1, § 8(a)(i)).  This position is reasonable and supported by the Agreement between the parties.  Harrison would be due $375,000.00 (severance of one year's salary) and $62,500.00 (two months' salary for compensation during the sixty-day notice period for termination).

M.  The damages for the breach of the RUGAs pose a different problem.  The parties have vastly different views on the value of these agreements.  Harrison seeks specific performance to take possession of the vested units granted to him under the RUGAs. Harrison proposes that he be awarded the units he would have received within the first two months of his employment presuming the sixty-day notice period for termination was exercised.  This would result in an award of 50% immediately on the Grant Date of February 2, 2020 and 2.77% for each of the two months he would have been employed before the sixty-day notice of termination was exercised for a total of 55.56% of each grant.

Specific performance of uncertainly valued stock options has

been utilized for awarding employee benefits.  *See e.g.* TaChotani v. Doubleclick, Inc., 714 N.Y.S.2d 34,35 (App. Div. 2000). Obviously, the RUGAs were essential to Harrison's decision to resign from BAC since the employment arrangement with Redbird could not become effective until both the Agreement and the RUGAs were executed.  As a result, Harrison's request for specific performance of the RUGAs is well-taken.  Harrison's proposal for the award of the RUGAs will be granted and the units will be granted in the percentages outlined.[3]

N.  Harrison includes a request for attorney's fees in his relief sought.  Any claim by Harrison to an entitlement to reimbursement for attorney's fees shall be addressed by separate motion.

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED that judgment is entered in favor of the Defendant, Matthew Harrison, and against the Plaintiffs, Redbird Business Group, LLC, Redbird Bioscience Oklahoma, LLC, and RB Realtyco, LLC on the claims asserted by Plaintiffs in this action.

---

[3] Harrison states in his Proposed Findings of Fact and Conclusions of Law that the additional claims for breach of the covenant of good faith and fair dealing, promissory estoppel, and breach of a guaranty need not be addressed, if he prevails on the breach of contract claim.  Since the damages for such additional claims would be duplicative of the damages awarded under the breach of contract claim, this Court finds it redundant to address those additional avenues for relief and will not do so further.

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that judgment is entered in favor of the Counterclaimant, Matthew Harrison, and against the Counterclaim Defendants, Redbird Business Group, LLC, Redbird Bioscience Oklahoma, LLC, and RB Realtyco, LLC on Counterclaimant's claim for breach of contract. Damages are awarded in the Counterclaimant's favor in the amount of $437,500.00 and Counterclaimant is awarded specific performance in the assignment of the unit grants in the percentages set out herein.

A separate judgment shall issue forthwith.

IT IS SO ORDERED this 31st day of March, 2023.

_____
JASON A. ROBERTSON
UNITED STATES MAGISTRATE JUDGE