**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF OKLAHOMA**


REDBIRD BUSINESS GROUP, LLC.,   )
REDBIRD BIOSCIENCE OKLAHOMA,    )
LLC, RB REALTYCO, LLC.,         )
                                )
                                )
               Plaintiffs,      )
                                )
          vs                    ) No. 20-CV-98-JAR
                                )
MATTHEW HARRISON,               )
                                )
   Defendant-Counterclaimant.   )
                                )




TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE JASON A. ROBERTSON
UNITED STATES MAGISTRATE JUDGE
JUNE 20, 2023




Shelley Ottwell, RPR, CSR
United States Stenographer
P.O. Box 607
Muskogee, Oklahoma 74402

*TRANSCRIPT PRODUCED FROM FTR AUDIO


UNITED STATES DISTRICT COURT - OFFICIAL TRANSCRIPT

**A P P E A R A N C E S**

ON BEHALF OF THE PLAINTIFF
Christopher T. Zona, Esq.
Mandlebaum Barrett PC
3 Becker Farm Road
Roseland, New Jersey 07068


Michael T. Maloan, Esq.
Foliart, Huff, Ottaway & Bottom
201 Robert S Kerr Avenue, Suite 1200
Oklahoma City, Oklahoma 73102



ON BEHALF OF THE DEFENDANT
Luke A. Connelly, Esq.
Winston & Strawn, LLP
200 Park Avenue
New York, New York 10166

R. Trent Shores, Esq.
GableGotwals
110 N. Elgin Avenue, Suite 200
Tulsa, Oklahoma 74120

```
1              P R O C E E D I N G S
2         (RECORDING COMMENCES AT 10:32 a.m.)
3         THE COURT:  All right.
4      We are on the record this morning in Case Number
5    20-CV-98-JAR.
6      Will counsel please enter your appearances?
7         MR. ZONA:  Christopher Zona of Brewer,
8    Attorneys & Counselors for plaintiffs Redbird Business
9    Group, Redbird Bioscience Oklahoma, Redbird RealtyCo,
10   along with my co-counsel.
11        MR. MALOAN:  Mike Maloan.
12        THE COURT:  Thank you, Mr. Zona and
13   Mr. Maloan.
14        MR. CONNELLY:  For the
15   defendant-counterclaimant, Luke Connelly of Winston
16   Strawn.
17        MR. SHORES:  And Trent Shores from
18   GableGotwals, and Mr. Connelly will remain lead counsel
19   today.  I'm happy to answer any questions you may have
20   as local counsel.
21        THE COURT:  All right.  Thank you,
22   Mr. Shores.
23      We are here today on three motions where the first
24   one is docket number 177, Defendant-Counterclaimant's
25   Motion to Set Rate for Prejudgment and Post-Judgment
```

1    Interest; docket number 178, Defendant-Counterclaimant
2    Motion and Brief in Support of Motion for Award of
3    Attorney Fees and Non-Taxable Expenses; and docket
4    number 190, Defendant-Counterclaimant's Motion to
5    Review Taxation Costs.
6        Gentleman or counselors, before we get started,
7    I'll simply point out you may notice that I do not have
8    a court reporter here this morning.  There's been some
9    difficulties on her end and she could not make it here.
10   However, everything is being recorded on our FTR
11   system.  Ms. Hayes has confirmed that that is working.
12       Is that correct, Ms. Hayes?
13           COURTROOM DEPUTY:  Yes.
14           THE COURT:  All right.  So everything is
15   recorded.  So if you require a transcript, just let us
16   know and we will still have one just as if she was
17   here.  She is just not sitting in the courtroom with us
18   today.
19       Very well.  With that being said, Mr. Connelly,
20   let's begin with -- well, let's go in order.  Docket
21   number 177, your motion to set rate for prejudgment and
22   post-judgment interest.
23           MR. CONNELLY:  Thank you, Your Honor.  Where
24   would you like me, front or back?
25           THE COURT:  Either podium.  It doesn't

UNITED STATES DISTRICT COURT - OFFICIAL TRANSCRIPT

1    matter.

2          MR. CONNELLY:  For the record, Luke Connelly

3    on behalf of the defendant-counterclaimant, Matt

4    Harrison.

5          This first motion is to set the rate of

6    prejudgment interest on the Court's judgment of

7    $437,500.

8          THE COURT:  If I read it correctly, we're

9    really just talking about prejudgment; is that correct?

10          MR. CONNELLY:  Correct.

11          THE COURT:  Okay.

12          MR. CONNELLY:  Yes, sir.  I believe we have

13    agreement as to what should happen with post-judgment

14    interest.

15          THE COURT:  Yeah, post-judgment, there

16    doesn't seem to be any question whatsoever.  We're

17    really just talking about prejudgment.

18          MR. CONNELLY:  That's correct, Your Honor.

19          So prejudgment interest is a question of New York

20    law in this diversity case.  We look to the state law,

21    and I believe we have agreement on that.

22          Under New York law, a successful party on a claim

23    for a sum certain, monetary claim for a sum certain at

24    law is entitled to prejudgment interest at the rate of

25    9 percent as of right.  That's in C.P.L.R. 5001, and we

1    cite that in the papers.  It does not need to be pled.

2    It doesn't need to be sought in the trial.  We cite

3    cases that stand for that proposition, Your Honor.

4        The C.P.L.R. uses the language that a prevailing

5    party for -- on an action at law for a sum certain is

6    entitled to prejudgment interest as of right.  The

7    C.P.L.R., and I think this was done in the 1960s, set

8    the interest rate at 9 percent, and that has been the

9    interest rate in the New York courts.  It might have

10    been in the '70s but I think it might be the '60s.  Up

11    through the '70s, '80s, '90s, 2000s, 2010s to today,

12    that is the rate.  There are people who say that is too

13    high.  And again and again, the court says that is the

14    rate in the C.P.L.R.

15            THE COURT:  And that has been the rate for

16    decades.

17            MR. CONNELLY:  Yes, and that has been the

18    rate for decades and it has not changed.

19        When you take the judgment, right, which has

20    really two monetary aspects to it.  One, is for the two

21    month's salary within that 60-day period, right.  When

22    you look at 9 percent for the two-month salary and then

23    for the severance, which would have been paid after

24    that for a period of a year -- when you look at that,

25    the 9 percent accruing, as those payments were made

1  over time, totals $178,000.125.  That is a corrected
2  number because we did agree with at least the
3  methodology that Redbird used in opposition.  So in our
4  reply we corrected the amount of prejudgment interest
5  sought.  Again, let me say for the record, to be
6  $178,000 and 12 and a half cents.  We could say
7  12 cents.
8      Again, we are entitled as of right in the New York
9  courts.  You go down to the clerk with a judgment and
10 it just gets filled in.
11         THE COURT:  What about Mr. Zona's argument
12 that the court should apply its discretion and apply an
13 interest rate that reflects federal funds?
14         MR. CONNELLY:  The language of C.P.L.R. 5'01
15 that contains that discretionary language is for an
16 action in equity, okay?  So, for instance, we sought
17 specific performance for those shares.  We're not
18 seeking prejudgment interest on those just to save time
19 and due to the complexity of doing so, but the Court
20 could in its discretion under C.P.L.R. 5001 award
21 prejudgment interest at a rate it so chooses on that
22 action in equity.
23     But that language, the discretion, does not apply
24 to an action at law where you have a sum certain, and
25 that's what the $437,500 on the breach of contract

```
 1   claim is.  It's a sum certain.  There is no discretion.
 2              THE COURT:  Okay.  All right.  Thank you.
 3              MR. CONNELLY:  Thank you, Your Honor.
 4              THE COURT:  Mr. Zona, why don't we pick up
 5   right there and talk about the discretionary.
 6              MR. ZONA:  Yes, Your Honor.
 7         So Mr. Connelly is correct, that 5001(a) does
 8   separate the equitable interest.  But if we look to
 9   New York case law, so Rhodes v. Davis 628, Federal
10   Appendix 787, Second Circuit case of 2015, the Second
11   Circuit actually held that where a plaintiff has sought
12   both damages and equitable relief, then that portion of
13   5001(a) does apply.  So the portion that gives
14   discretion to the court.
15         So it's Redbird's position that this Court does
16   have discretion over the entire, the entire prejudgment
17   interest set against all relief because this isn't two
18   cases.  While there are multiple claims, there's a
19   single judgment and prejudgment interest will be set on
20   the single judgment, which includes both equitable
21   relief as well as monetary relief.  That split relief
22   gives this Court discretion to set a rate to also
23   determine whether or not prejudgment interest is even
24   necessary and also set the date certain on when that
25   prejudgment interest will begin to run.
```

1          Given the unique circumstances of the past two

2     years with record low interest rates, and when you

3     couple that with the actual purpose, when you dig back

4     into the case law, the purpose of prejudgment interest

5     it's to compensate an aggrieved party for the loss of

6     use of that money for the time that they lost it.

7          Even if we look at the case law, why are we using

8     New York case law?  Because it's compensatory damages.

9     These aren't punitive damages.  And taking a 9 percent

10    interest rate when record lows of .06 and point, you

11    know, less than one percent is actually the prevailing

12    interest rate and the prevailing effective federal

13    funds rate, creates a punitive circumstance where it

14    becomes an additional windfall recovery.  We're talking

15    about, you know, $100,000 on a $400,000 monetary claim.

16    That's a windfall recovery.  That is not designed to

17    just compensate Mr. Harrison for the loss of use of

18    money between March 2020 and March 31, 2023.

19              THE COURT:  Do you have any citations where a

20    New York court has done exactly what you're suggesting?

21              MR. ZONA:  Only the *Rhodes* case has actually

22    given discretion to a Court to apply its discretion and

23    not follow the 9 percent, but not a direct case that's

24    on point saying that a court declined the 9 percent,

25    no, Your Honor.

1              THE COURT:  What about the argument 9 percent

2    is the number that we should go with if we're going to

3    decide there should be prejudgment interest?

4              MR. ZONA:  No, Your Honor.  The same if we --

5    so, again, in Redbird's position it's a three-prong

6    analysis.  If we're going to apply 5001(a), the

7    equitable portion, because this Court granted both

8    monetary and equitable relief, so if we're going -- if

9    Your Honor is in agreement, at least in arguendo for

10   that point, once you decide that you're going to set

11   the interest rate, so that's the first prong.

12        The next prong is what's the date certain of the

13   beginning of that or the beginning of each?  And it's

14   Redbird position, I believe Mr. Connelly's chart

15   reflects this, the beginning date for each interest of

16   accrual occurs at the end of the month where a payment

17   would have been made.  I think for the two months, and

18   then as well because I believe payments were monthly, I

19   believe that's how the accrual was drawn out, if I

20   remember correctly, all the way up to $437,500, and

21   then it was a straight interest rate applied to the

22   following remainder.  I believe that's how it is.

23        So the date certain that Redbird has asserted is

24   that it's the date of the accrual of those damages,

25   which would be the end of every month when conceivably

1    a paycheck would have been issued.

2            THE COURT:  So the table that I believe we're

3    talking about is the one that's in the reply document

4    number 185.  You have no argument with those actual

5    dates as to when it should start accruing.

6            MR. ZONA:  No.  Those are the dates.  I

7    believe that, the dates there actually reflect that the

8    charted dates that Redbird's opposition had, it's just

9    we're arguing about the numbers.

10           THE COURT:  Okay.

11           MR. ZONA:  And then the third -- then, Your

12   Honor, so once you get by those two prongs, the third

13   prong is then setting the interest rate.

14           THE COURT:  And that's where the

15   discretionary comes in because of the mixed equity and

16   specific --

17           MR. ZONA:  Correct, Your Honor.

18           THE COURT:  Okay.

19           MR. ZONA:  And then at that point that is

20   where it is Redbird's belief that setting, you know,

21   just -- blindly setting the 9 percent rate without

22   looking to the other factors that normally a Court

23   would take into account in an action that's in equity

24   or split in equity in money damages those factors are

25   just real-world factors.  These aren't even factors

1  that we're talking about specific to the parties, and

2  those are the same factors that are looked at in the

3  post-judgment when we look at the effective federal

4  funds rate.

5          THE COURT:  Okay.  All right.  Thank you,

6  Counselor.

7          MR. ZONA:  Thank you, Your Honor.

8          THE COURT:  Mr. Connelly, would you like to

9  go one more time?

10          MR. CONNELLY:  Very briefly, Your Honor, and

11  just for a point of clarification.  I don't believe the

12  *Rhodes* case was cited.  If it is material to Your

13  Honor's analysis, I would like the opportunity to

14  respond to it when I can actually see the case.

15          THE COURT:  Would you give me the cite to

16  that *Rhodes* case one more time?

17          MR. ZONA:  Apologies, Your Honor.  It's 628

18  F. Appendix 787.

19          MR. CONNELLY:  Not having the case and not

20  having prepared on it, that is contrary to my

21  understanding of New York law, which is that, if it's a

22  sum certain there is no discretion.  And especially

23  where it would be one thing if there were two

24  overlapping claims for the same amount.  One equitable,

25  one for a sum certain, I could see then there may be an

1    argument that you're seeking equity for that amount.

2    You know, like a specific performance claim for that,

3    right, for that amount.  And in that case, the court

4    may have discretion but here we're dealing with two

5    separate, right?  Actually entirely separate contracts

6    as well, so --

7             THE COURT:  All right.  And having not seen

8    the *Rhodes* case yet, it's your interpretation of

9    New York law that this Court has no discretion?

10            MR. CONNELLY:  Correct.  That you have to

11   follow the C.P.L.R. and award a prejudgment interest on

12   this sum certain of $437,500.

13            THE COURT:  Okay.  Thank you, Mr. Connelly.

14            MR. CONNELLY:  Sure, thank you.

15            THE COURT:  You might as well as stay there.

16   We'll just move on the next one, which is number 178,

17   which is your motion and brief for attorneys fees and

18   non-taxable expenses.

19            MR. CONNELLY:  Yes.  Thank you, Your Honor.

20   Luke Connelly, again for the defendant-counterclaimant.

21   And here, again, I just wanted --

22            THE COURT:  I guess I'll clarify for the

23   record before we get started.

24        Do you have any expert witnesses that you would

25   like to call today to support your request for fees?

1          MR. CONNELLY:  We do not.

2          THE COURT:  Okay.

3          MR. CONNELLY:  I leave it at that.  We don't

4    believe that's necessary under that case law.

5          I will start, Your Honor, also by clarifying for

6    the record the amount in fees sought because there was

7    a typo in the brief.  Then also counsel did point out

8    an unrelated charge that should have been excluded like

9    the others.

10         So for the record, this is in our reply brief,

11   counterclaimant seeks $1,212,552.  $1,212,552 for the

12   nearly three years of active litigation in this matter.

13         On this motion, Your Honor, under the applicable

14   case law both Tenth Circuit and New York, the question

15   is whether it would be inequitable or unreasonable to

16   award the fees requested under the circumstances,

17   right, and the court is to perform an analysis that

18   takes into account the circumstances of the litigation

19   and the litigation itself.

20         And we submit, Your Honor, that it is neither

21   unreasonable nor inequitable.  In fact, very reasonable

22   to award the full amount sought under these

23   circumstances.

24         And we begin with the contract itself, right?  The

25   fee provision of this contract as set forth in the

1  papers is unusual.

2          THE COURT:  Right.  It's unusual when you

3  have one that would use the language "wholly and

4  completely," which is what you have in this particular

5  contract; is that correct?

6          MR. CONNELLY:  That is correct, Your Honor.

7          THE COURT:  So in your opinion the terms of

8  the contract itself, would that exclude the Court from

9  looking at the reasonableness?

10          MR. CONNELLY:  I think, Your Honor, no.

11      I think that you, as a federal judge, overseeing

12  this matter and overseeing the practice of law before

13  Your Honor, always have the ability to look at the

14  unreasonableness and inequitability -- inequity of a

15  fee application.  I do believe, though, because of the

16  language of this contract, Redbird's knowledge of its

17  unusual nature, right, and it's one-way nature that it

18  is entirely reasonable to award the amount sought.

19      So in short, Your Honor, you always have the

20  discretion we concede.

21      Now, after entering into this contract with this

22  unusual provision, right, just about a week later,

23  right, knowing it would be on the hook for Harrison's

24  fees in any action, Redbird then unilaterally attempted

25  to rescind the contract, as you know, which was the

1  central act that gave rise to this action before you.

2       And they did so, right, after the meeting with

3  Brewer, after Brewer said this is not yours to deal

4  with, as Your Honor, found, and what to do with

5  Harrison is my decision.  The very next day after that,

6  Byars sent the letter attempting to rescind the

7  contract.

8       Harrison responded to that letter.  I wrote the

9  response and in that we reminded Redbird of its

10  obligation for fees, and warned Redbird that if this

11  went forward, the fees would be substantial, right.

12       After that letter, I spoke with Joe Byars and

13  tried to settle this matter before it escalated into

14  litigation but to no avail.

15       A week after that phone call, Redbird then sued

16  Harrison in the state court of Oklahoma, which then set

17  this entire litigation into action.  And significantly,

18  right, Redbird attempted to rescind and brought this

19  lawsuit without seeking board approval, and very

20  significantly Redbird asserted claims all under New

21  York law against Harrison, right, and a declaratory,

22  including a declaratory judgment claim to say that

23  Harrison had committed fraud.  They rushed in order to

24  secure venue because this action could have properly

25  been litigated in New York and Redbird in its haste

 1   came out here to Oklahoma to state court to force

 2   Harrison to litigate out here knowing that Harrison had

 3   a New York lawyer because I had written the letter,

 4   okay.

 5        Then over the next nearly three years we litigated

 6   here.  You know, first we removed the case to federal

 7   court, and I can go through the actions, Your Honor,

 8   just for the record very briefly, the activities of

 9   counsel and staff that account for the fee request

10   here.  But it started with analysis, the complaint,

11   removal to federal court.  Then motions to dismiss.  We

12   made a motion to dismiss under the court's rules.

13   Redbird had the opportunity to amend and then we remade

14   the motion, okay.

15             THE COURT:  Let me see if I can summarize for

16   you.  It's your opinion that they declared this war.

17   They set the terms and you fought it on the battlefield

18   they chose.

19             MR. CONNELLY:  That is correct, Your Honor.

20   That is very well said, yes.

21             THE COURT:  With that being said, is there an

22   argument about reasonableness of the army you brought

23   to this battle?  Did you employ too many people?  Did

24   you put too many resources into the battle that was

25   chosen?

 1          MR. CONNELLY:  We did not.  We put the

 2    resources necessary, Your Honor.  And they are New York

 3    resources by and large but we needed Oklahoma counsel

 4    as well.

 5          And if you look at it over time, there really is

 6    always a core team of myself and an associate and then

 7    two lawyers from GableGotwals, and necessary staff.

 8          But what happened, there were a couple of points

 9    where due to a particular time crutch in the

10    litigation, we needed more people.  And the real

11    particular one is in the beginning of 2021 where we

12    were taking depositions.  Under the court's scheduling

13    order, we had to move for summary judgment.  Redbird

14    made a motion for summary judgment as well, so we had

15    dueling summary judgments.  Redbird made a motion to

16    quash.  Then under the court's schedule, all of our

17    pretrial filings were immediately due, including the

18    pretrial order, and jury instructions, and motions in

19    limine.

20          So within the space of about two-and-a-half

21    months, we were taking depositions and briefing several

22    motions, so at that time I added two associates who

23    were only on for that short period of time.  Other than

24    that, it really is a core team of a Winston partner and

25    an associate, and that associate changed over time, and

1    then the lawyers from GableGotwals.

2            THE COURT:  Let me jump to maybe the third

3    issue that we have in this case, which is obviously the

4    reasonableness of the fees themselves charged, your

5    billable rates.

6            MR. CONNELLY:  Yes.

7            THE COURT:  Should the Court not look to the

8    community rates when I'm setting a reasonable -- if I'm

9    going to set a reasonable rate in this case, why should

10    I look to New York rates versus what a reasonable

11    community rate would be?

12            MR. CONNELLY:  Harrison was actually, at the

13    time the lawsuit was filed, a resident of New York.

14    He's since moved to Connecticut but he worked in

15    New York.  He lived in New York.

16        This is in many ways a New York litigation as much

17    as it is an Oklahoma litigation because the Brewer firm

18    is in New York and that's where Harrison worked.

19        Also, it's New York law, the contract was.  All

20    these claims were under New York law yet Redbird, I

21    give them credit, came up with some very creative, to

22    put it nicely, arguments, the fraud claim, the

23    duty-to-speak theories that go way back to the late

24    19th Century.  These are really very arcane issues of

25    New York law that I believe as a New York lawyer,

because I have litigated in New York, right, my entire
career, these sorts of cases I could more easily and
effectively address than lawyers who have not done so.

Also, when you peel it away and you look at the
war that Redbird started, it really is a proxy battle
really with Brewer behind the scenes pulling the
strings.  That's what we saw ultimately at trial when
the Brewer firm provided very, very, capable counsel at
no-charge, right, from the New York office to litigate
this case here in the Eastern District of Oklahoma.

So when you step back and really look at it, it's
entirely fair, and we believe entirely necessary, to
use New York lawyers and those are the rates.  In fact,
there is a lot of support under the Tenth Circuit
precedent where you have a defendant who is not from
the jurisdiction using the rates in the community where
the defendant is from.

And again, the biggest issue here, what's clearing
Harrison's name from this fraud claim, which Redbird
brought and publically filed and trotted out at every
opportunity in its public papers, so we do believe
New York, the New York rates are entirely appropriate.

I don't think it's really disputed under the case
law yet thousand-dollar-an-hour-plus rates are
reasonable in New York.  They have been held so by the

1    New York courts.  In fact, entered as an exhibit in

2    this case is the Brewer firm retainer letter and Bill

3    Brewer is as much a New York lawyer as a Texas lawyer,

4    and the max rate at the Brewer firm is $1400 an hour,

5    and that was in 2018.

6        If counsel would indulge us, I'm sure the rates

7    have gone up since then.

8            THE COURT:  I'm curious, and I'll ask the

9    same question to Mr. Zona, have you done have any

10   research into what this Court has previously awarded

11   any people that have requested fees?

12           MR. CONNELLY:  I have seen cases, and looking

13   at the local -- looking at this community, the numbers

14   are lower.  And, actually, Mr. Shores is able to

15   address the Oklahoma community rates.  But I did not

16   see authority in this court for rates comparable to the

17   New York rates.  But we submit that the New York rates

18   are entirely necessary here because the New York

19   lawyers were necessary here because this was the war

20   they brought, and we were the lawyers at the time and

21   these are really New York claims that could have and

22   should have been litigated in New York against

23   Mr. Harrison.

24           THE COURT:  Okay.  Thank you, Mr. Connelly.

25           MR. CONNELLY:  Okay.  Thank you.

1          THE COURT:  Is there anything else that you
2    would like to add?
3          MR. CONNELLY:  As long as I can reserve
4    time --
5          THE COURT:  You may.
6          MR. CONNELLY:  -- I would like to be
7    responsive.
8          THE COURT:  Thank you.  Mr. Zona.
9          MR. ZONA:  Thank you, Your Honor.
10          THE COURT:  So you have heard my issues that
11    I brought up.  How would you address those?
12          MR. ZONA:  Certainly.  We can start with the
13    army suit.  I think the army quote is on point, but
14    this is like setting the type and ammunition and
15    ordinance that the army can use actually in battle.
16    That's what this Court has the ability to do and when
17    you look at that, that goes to the number of billing on
18    a case whether or not that's reasonable.  It goes to
19    the rates being charged whether or not that's
20    reasonable.
21        You are kind of like the law of war that will
22    oversee the results of this battlefield.  So while they
23    may have chosen to bring an army from New York, as
24    Mr. Connelly said, that choice was made far before any
25    claims were brought.  There were no claims.

UNITED STATES DISTRICT COURT - OFFICIAL TRANSCRIPT

1          So, you know, those two arguments are a little bit
2    at odds with one another.  To say that these are
3    archaic New York contract claims and that's why he was
4    engaged, but as we just heard him state he was engaged
5    far before that.  He was engaged because his client
6    lived in New York.  The fact that he came out to the
7    Eastern District of Oklahoma, Redbird, even though they
8    brought these allegedly archaic New York claims,
9    engaged Oklahoma counsel until it was clear that this
10   was going to trial against a big-law law firm, Winston
11   Strawn, one of the largest law firms in the world and
12   that New York City counsel or New York counsel might be
13   better situated to bring to bear against, as
14   Mr. Connelly states in his papers, a 30-year litigator
15   with this extensive experience defending large New York
16   institutions with a former U.S. attorney for the
17   Northern District of Oklahoma as his local counsel --
18         And, Your Honor, if it's okay I'm just going to go
19   backwards.
20              THE COURT:  Let me just ask you the same
21   thing that I did him.
22              MR. ZONA:  Certainly.
23              THE COURT:  Do you have an expert witness
24   that's going to testify today?
25              MR. ZONA:  No, Your Honor.

1        It is Redbird's position that the burden here is

2    entirely on Mr. Harrison.  And the case law that's

3    actually, you know, Your Honor asked about, the *Brown*

4    case, which is cited in our papers, was released on the

5    same day I think that this -- the fees were either due

6    or the fees -- that came out April 14, 2023, that was

7    out of this case -- out of this court, and it discussed

8    specifically the rates and the local community and the

9    discussion of those rates.  I think it looked at the

10   *Busby* case, if I'm not mistaken, which is the Northern

11   District, and, you know, the case law seems to attach

12   the Eastern District to the Northern District as far as

13   differentiating from, my understanding, would be the

14   Western District, which may be on a different

15   quote/unquote relative community.  And there is

16   extensive -- there are extensive discussions in these

17   cases and the other cases cited, and I apologize, Your

18   Honor, for not having them on my tongue but they were

19   all cited where rates were specifically discussed, what

20   the rates, and the prevailing market rate for different

21   sorts of counsel.  Seasoned lead counsel, less seasoned

22   lead counsel, associates, paralegals, legal staff,

23   support staff were all discussed.

24        And under the case law, as far as Redbird

25   understands within the Tenth Circuit, if there isn't

 1    sufficient evidence brought to bear by the movant, then
 2    the court can use relevant factors, which Redbird
 3    submits would be prior analysis, as well as prior suits
 4    coming out of either this or the Northern District or
 5    whatever this court decided is the relative local
 6    community, as well as the Court's own knowledge of what
 7    the rates within the relative community is.
 8        The fact that this may be an alleged proxy war or
 9    where the, you know, the contract was or where
10    Mr. Harrison resided at the time, that's not what the
11    case law discusses.  The case law says the rate is to
12    be set where the court sets.  I believe it's the *Jane*
13    case, which is a Tenth Circuit case, distinctly says
14    that the Salt Lake City case will use Salt City rates.
15    It declined to take the New York city approach because
16    it's not about where the parties come from.  It's about
17    where the case is being tried.  This case is tried in
18    Oklahoma.
19        Under the case law, it should be this district's
20    prevailing local rate or if this court wishes to
21    indulge in Northern District as well, it's Redbird's
22    position that it has cited sufficient case law.  It
23    actually has been fairly fair in how it analyzed that
24    case law from low and high and given this court a range
25    of what the Eastern District and the Northern District

1  have determined to be reasonable rates for --

2  reasonable hourly rates for both partners of kind of

3  the lead-counsel model as well as associates as well as

4  support staff.

5         THE COURT:  Was this a complicated and arcane

6  case to try?

7         MR. ZONA:  Your Honor, this is a New York

8  contract law case with less than ten witnesses, no

9  experts.  It took four days.  That's not to say that

10 any of the diligence done by the parties was not to the

11 upmost or that the issue --

12        THE COURT:  I'm not implying any trial is

13 easy.  I was a trial attorney.  Every trial has its

14 difficulties and complexities.

15        MR. ZONA:  Correct, Your Honor.

16        THE COURT:  I'm just asking:  Is this case

17 any different or is it exceptional in what it took to

18 try this case versus an oil and gas royalties case?

19        MR. ZONA:  Your Honor, not only was this case

20 pretty straightforward as far as what the contract

21 claim was and issues that were there and the types of

22 witnesses, the motion practice was extremely standard.

23 There were no motions in limine.  There were no

24 immediate post-trial or mid-trial motions.  There

25 wasn't an extensive number of witnesses.  There weren't

 1    even an extensive number of depositions.  There weren't

 2    specific issues that were very much unique to New York.

 3         So while, you know, we heard about arcane New York

 4    issues, they were your standard agency issues.  While

 5    they may have taken a New York bend, Redbird was using

 6    local counsel up until trial.  So certainly a lot of

 7    the briefing was done by local Oklahoma counsel such

 8    that those New York issues were not so complicated the

 9    plaintiff previously in this case was not able to

10    function with it.  So, no.

11         This is not one of those, and I believe the case

12    law talks about those rare circumstances where either

13    local counsel is unavailable or refused to take up the

14    type of claims that were being brought or the issues

15    were so specified and specific to the jurisdiction --

16    like, if this were a New York corporate, you know,

17    non-profit corporate regulatory case that happened to

18    be out here for some sort of solicitation, okay, in

19    that circumstance there may need to be a specific

20    attorney who only deals in that world.  We're talking

21    about a contract case where really it came down to

22    fraud or fraud for rescission versus a breach of

23    contract.

24              THE COURT:  Which would have been just like

25    it would have been in Oklahoma just citing different

1    case law.  I didn't mean to cut you off.

2              MR. ZONA:  Certainly, Your Honor, and I'd

3    like to be more responsive, and I apologize.

4         But kind of reversing through it, I know that you

5    had kind of set your course in three different

6    directions, and I know that handled your last one.

7         Your Honor went to, I want to say, billing

8    practices next.  I can't recall at this point.

9              THE COURT:  You can address them however

10   you're most comfortable with.  You don't have to go by

11   how I outlined it.

12             MR. ZONA:  Certainly, Your Honor.

13        So just kind of reversing back through, so one

14   thing that was not addressed was the concept of

15   across-the-board reduction.  I think this concept is

16   actually quite well borne out in both the Second and

17   Tenth Circuit.  They are both very much in agreement

18   that block billing is seriously disfavored.  It is not

19   a per se unreasonableness.

20        But the issue here is actually highlighted by the

21   briefing in reply to Redbird's opposition, and that's

22   where Harrison takes issue with certain time entries

23   that Redbird challenged.  They challenged the entirety

24   of time entries, you know, wherein travel was

25   incorporated in multiple other activities and, you

1  know, Redbird challenged the entire time entry as being

2  illegitimate.  That actually highlights the reason why

3  block billing is seriously disfavored.  It highlights

4  the reason why block billing creates across-the-board

5  reductions.  Because at the end of the day, it is this

6  Court's duty to look at the reasonableness of every

7  single charge and every single fee that's charged in an

8  attorney's fee billing.

9      Mr. Connelly was not required to put in all of the

10  billing invoices but he chose to and that's now in

11  evidence before the court.  He concedes that this Court

12  always has discretion regardless of the fee-shifting

13  nature of the contract.  Of course, he has made that

14  concession because under New York law and under

15  prevailing Tenth Circuit law it recognizes that even a

16  fee-shifting provision in a contract does not mean that

17  this Court has to close its eyes to the reasonableness

18  or the equitableness on it nor does any of that comport

19  with ignoring the relevant community rates and any of

20  the other case that trails along.

21      But the block billing is highlighted because those

22  entries cannot actually be seen for what they are.

23  It's unknown how much time was spent doing legitimate

24  tasks versus doing non-attorney work or traveling,

25  which there's other case law that was, you know, pretty

 1    much ignored in the reply that travel time should only

 2    be billed at half, half rate, at most if not completely

 3    ignored by the court.  So the equitable billing

 4    entries, and this is very intricate.  And I understand

 5    that in the opposition, you know, Redbird has laid out,

 6    you know, six different, like a path of six different

 7    ways, and the way in which that Redbird saw that they

 8    should be done, taking hours out first and, you know,

 9    drilling down to, quote, the core team, which

10    Mr. Connelly even conceded was the core team of the

11    litigation, drilling down to those so that we reduce

12    the hours and then we set a rate and then any

13    across-the-board reduction would be in this court's

14    discretion on whether that reduction would be against

15    the rate or it would be the total accumulative rate of

16    the aggrate dollars or would it be against the hours

17    billed.  And that would be the one place where I think

18    the Court does have discretion on how most fairly to

19    apply that across-the-board reduction.

20            THE COURT:  In using your term of the "core

21    team," I'm kind of adopting what and you Mr. Connelly

22    have said.  It appears from your brief that you

23    identified the core team as Mr. Connelly, Mister -- I'm

24    going to say it -- LaBrecque.

25            MR. ZONA:  LaBecque.

1           THE COURT:  Mr. LaBecque, Mr. Broner,

2    Ms. Forte, Mr. Cooper, Mr. Shores, Mr. Roderick, and a

3    Ms. Brooks; is that correct?

4           MR. ZONA:  Yes, Your Honor, that was -- you

5    know, Redbird was attempting -- was not.  I don't

6    believe that that's a streamlined -- that's a fairly

7    significant team to try this case.  That's several

8    associates, several partners, two paralegals.

9    Understanding that this was, you know, to the extent

10   that Mr. Connelly's papers alleged that there were, you

11   know, 1600 or so hours spent on this case or something

12   to that effect, that is a fairly significant core team.

13          And, you know, it is Redbird's position that those

14   should be the billers.  There should not be any shadow

15   billing from other folks that are coming in and coming

16   out.  When you have that significant amount of attorney

17   power for a case that had one motion for summary

18   judgment each way, you know, no motions in limine, no

19   expert depositions to prepare for, no exclusionary

20   motions on evidence or otherwise, a couple depositions

21   of key witnesses, you know, that is a

22   more-than-sufficient team.  Those should be the only

23   individuals who should be allowed to bill in the

24   matter.  There are -- and there are not a drastic

25   number of entries that Redbird takes issue with but

1    those hours should be denied.  It is not attorney work

2    to work on the logistics of a deposition regardless or

3    whether or not it was in COVID times or otherwise.

4    That's not billable to a client.  That's your

5    organizing papers.  That is what you hire, you know,

6    either a vendor for who is being billed at a different

7    rate or you're using support staff.  And I don't mean

8    that pejoratively against support staff but they're

9    billing at a much lower rate.  You shouldn't be using

10   someone who, I believe, was billing $600 to $800 to set

11   up a computer for a deposition.

12           THE COURT:  Where did you come up -- because

13   in your response, you have "apply a 40 percent

14   across-the-board reduction to the resultant total hours

15   because of rampant improper block billing."

16       How did you come up with 40 percent?

17           MR. ZONA:  So, Your Honor, if you look at the

18   case law, I think New York suggests that 15 to

19   30 percent is a standardized reduction for block

20   billing.  If you trace that into the Tenth Circuit, it

21   goes also to 30 percent and then there seems to be the

22   kicker that up to 40 percent has been allowed where

23   there are other -- I mean, it's Redbird's position that

24   there are other issues here.  So if there were just a

25   pure block billing challenge, then 15 to 30 percent in

1    that range probably would be more sufficient.

2         However, we've also seen, you know, overstaffing

3    in the papers.  I think it's about 500 hours of what I

4    call -- what I described is like shadow billing where

5    these random folks are coming in and out of the case

6    and shadow billing on the matter.  That's a significant

7    chunk of time, especially when we're talking about

8    New York rates.  That coupled with, you know, other

9    smaller things but billing for non-attorney work,

10   billing for redundancies, billing full rates for travel

11   time just suggests that this is more improper billing

12   than just block billing.  It's not as if all of the

13   entries are perfect.  They aren't just separated with

14   differentiated time.

15        This is a case in which, you know, Redbird has

16   suggested to the court that there are other things

17   going on, and 40 percent has been upheld, up to

18   50 percent has even been upheld.  And, again, I can't

19   recall in either the Second or Tenth Circuit but 40

20   percent was upper rate that Redbird -- and, of course,

21   it's the Court's discretion to determine how those

22   other practices play in any across-the-board reduction.

23             THE COURT:  It appears that you're asking

24   this Court to set an hourly rate for partners at $350

25   per hour.  But if I were to do that, this Court were to

1   do that, that would be lower than even what local

2   counsel Mr. Shores is charging in this case.

3        So why would the Court set an hourly rate for

4   partners lower than what local counsel is billing in

5   this case?

6             MR. ZONA:  Well, Your Honor, local counsel

7   doesn't determine the relevant community rate.  The

8   prevailing rate in the relative community is not

9   determined by the billing rate of one of the largest

10  law firms here in Oklahoma.

11       There's no evidence before this court that the

12  Oklahoma -- that GableGotwals differentiates its rate

13  between the Western District of Oklahoma, the Northern

14  District, and the Eastern District, or individuals that

15  are stationed at each.  But there is clear case law in

16  this district, in this circuit, that says that you,

17  Your Honor, should be looking to Eastern District

18  first, then the incorporation of Northern District and,

19  you know, versus incorporating the Western District.

20            THE COURT:  There's not a lot of firms within

21  the Eastern District.  So typically we would be looking

22  to the Northern District where the majority of firms

23  are based.  Obviously, we have the Western District,

24  but in this particular case, as you pointed out, the

25  Eastern and Northern are sort of tied at the hip, for

UNITED STATES DISTRICT COURT - OFFICIAL TRANSCRIPT

1 lack of a better phrase, when it comes to looking at a

2 firm and its rates.

3     Are you suggesting that the rate that Mr. Shores

4 charges is unreasonable for the Northern District?

5         MR. ZONA:  Yes, Your Honor.  I would submit

6 that if this Court were to be looking at a purely

7 GableGotwals' case then the same motion would be being

8 made given the *Brown* decision, which this court just

9 issued, where $350 or $400 or $450 was a rate.

10     It's my understanding reading those cases those

11 were Oklahoma counsel.  So it's not as if they're

12 non-Oklahoma counsel who were coming in here and the

13 Court was just setting a rate for them based on, you

14 know, the folks down the street.  Those were Oklahoma

15 counsel, so they were charging a rate that was beyond

16 it and the court didn't just simply take that rate

17 because it's the Oklahoma rate.

18     In the papers, and I understand that, you know,

19 this was not put forth in evidence, but, again, you

20 know, the Court can take into relevant factors into

21 account as well as its knowledge, but local counsel for

22 Redbird charged under $300 and was a partner with

23 similar experience.

24     So there is no prevailing -- you know, the fact

25 that GableGotwals sets a certain rate for its

1    attorneys, does not make that the prevailing rate.

2        If we go to New York City, you know, one firm may

3    be charging an $1,000 an hour for an associate and

4    another one may be sitting at $600.  The

5    thousand-dollar-an-hour associate doesn't make it a

6    reasonable associate.  It just means that firm is able

7    to charge its clients a thousand dollars an hour.

8        It's always within the Court's discretion to

9    determine whether or not that's a reasonable rate.

10            THE COURT:  I think that's it.  Is there

11   anything else that you would like to add?

12            MR. ZONA:  No, Your Honor, unless the Court

13   has further questions.

14            THE COURT:  Thank you.

15       Mr. Connelly?

16            MR. CONNELLY:  May I address a few points,

17   Your Honor?

18            THE COURT:  You may.

19            MR. CONNELLY:  On the trial itself, okay,

20   Your Honor had asked Mr. Zona, So this was a simple

21   trial.  The reality is by the time the case got to

22   trial it was simplified.  And I think as, Your Honor,

23   will recall we tried a very, very narrow case and

24   frankly it became a he said/she said between Harrison

25   and Thurman.  That is not the way the case was

1    initially and not the way it progressed through

2    discovery for a variety of reasons.  That is the way we

3    elected to try it in a very streamlined, narrow

4    fashion.

5        And I realize, Your Honor, came to the case as

6    trial counsel.  Mr. Zona was -- or the trial court.

7    Mr. Zona was trial counsel.  I can tell you throughout

8    the case it was far more complicated, and you only have

9    to look to Redbird's opposition to our summary judgment

10   motion where they cited 30 cases on reasonable reliance

11   alone, and to sort of throw-it-all-against-the-

12   kitchen-sink strategy that they employed that required

13   a tremendous amount of work, and it was in that time

14   that we brought in those two additional associates.  So

15   they're not shadow billers.  They were additional

16   resources needed because of the schedule crutch created

17   by the briefing and the trial -- the Court's schedule.

18       And I will say, just at one correction, there were

19   motions in limine.  Redbird made motions, two separate

20   motions in limine, which we opposed again at this time.

21       Significantly the biggest issue is, okay, New York

22   rates.  Why are -- we are New York lawyers; why use

23   New York rates?  This is a critical issue, and it's

24   frankly extremely important.

25       We're in this court and there are two New York

lawyers before you.  Now, that's not a reaction to my
being a New York lawyer, okay.  It's a reaction to the
fact that Brewer was behind this thing.  And he is a
New York lawyer and he used lawyers from his firm to
assist in this matter, okay?  Brewer was a party in
this matter initially, okay?

     So this was a "New York against New York with
Redbird in the middle" situation from the very
beginning.

     We said repeatedly in our opening brief that this
was a proxy war, okay?  Redbird never denied that at
all.  I said today it was a proxy war.  Counsel for
Redbird didn't deny it again.

     Brewer was behind the scenes from the beginning.
We know, as Your Honor found, that he made the decision
to attempt to rescind this contract.  So it isn't that
New York counsel has come and inserted themselves in an
Oklahoma litigation.  It's that this is a litigation
that involves New York and Oklahoma and that Redbird
brought this war knowing that it's a New York case
under New York law and that Harrison was in New York
and he had a New York lawyer.

     And if the tactic was to try, you know, split
Harrison from his New York counsel in order to
litigate, well, that's a terrible tactic and they

 1    shouldn't be rewarded for that.

 2         And we did, Your Honor, litigant this case

 3    efficiently.  We certainly tried it efficiently as you

 4    saw.  We called one witness.  We agreed to admit most

 5    of Redbird's exhibits, if not all of them.  They turned

 6    out being good for us, which is the way this whole case

 7    has gone.  But what complicated the case, yes, there

 8    are these arcane issues of New York law, which were,

 9    you know, superficially appealing.  But, you know, like

10    a house of cards that needed to be addressed and that

11    Redbird's witnesses, this primary witness, Mr. Thurman

12    was not a very consistent witness, let's just say that.

13    It requires a lot of work to keep Redbird on track and

14    actually fact-check them in realtime.

15         Let me give you an example here, and turn around

16    Mr. Zona's attempt.  What Redbird did in its opposition

17    on the specific billing entries is entirely typical for

18    the way they litigated this case, which is they

19    misstated what the entry actually said the entire time.

20    In most -- you know, of those entries, most of them are

21    misstated and there is far more to the entry.

22         Now, Mr. Zona tried to flip it around, and say,

23    oh, that's now because it's block billing.  That's not

24    the way the brief read.  So we had to go through every

25    single one of these entries, as we would, and I invite

the court to do so.  We cited them and gave the correct language in our reply.  But they took great liberties with the facts, as they did in their post-trial briefing.

Look, any case where the post-trial briefs total over, you know, I think 200 pages when you take the responses, that's not a simple case.  At trial it turned out to be simple in our minds because I thought Thurman was taking liberties, okay, and I thought Harrison was credible.  And that that was the best way to try the case.

As you saw, our cross-examinations of Patel and Byars were relatively short.  Most of the time was on Thurman, and we tried a very streamlined case but we got there only after substantial work.  You know, that work included, I think in this very courtroom, a summary jury trial before Judge West.  We did this half-day presentation in front of a live jury.  The whole purpose of which is to give the parties a reality check on their case to see if they should settle.  That required a lot of work to prepare for, but I would have hoped we could have resolved it after that but we did not.

At every step I have been trying to resolve this case.  And Harrison needed me because I was familiar

```
1    with the case from the very beginning, and New York
2    lawyers because it really was Brewer behind the scenes.
3    And they finally came out, you know, from behind the
4    curtain at trial.  And imagine that, he provided trial
5    counsel for free to litigate against someone who has to
6    pay their own bills.
7         Like, that's pretty extraordinary and shows you
8    Brewer's willingness to be involved in this case, and
9    it really would be an injustice, Your Honor, to use the
10   Oklahoma community here when looking at rates when this
11   really is a New York case, which is the way they
12   brought it knowing --
13             THE COURT:  If the Court were going to use
14   New York rates, what evidence is in front of me that
15   the rate that you're requesting is reasonable and
16   customary in New York?
17             MR. CONNELLY:  Yeah, we cited multiple cases
18   in our briefs, Your Honor, that line up.
19             THE COURT:  Okay.
20             MR. CONNELLY:  In the reply there -- and I
21   can read them.  They are both in the moving brief and
22   the reply.
23             THE COURT:  If they're cited in the brief,
24   you don't have to read those.
25             MR. CONNELLY:  Yeah, that's right and, in
```

UNITED STATES DISTRICT COURT - OFFICIAL TRANSCRIPT

1    fact, the Brewer engagement letter has as its range

2    $200 to $1400 an hour for attorneys.  So we believe

3    that external --

4              THE COURT:  That's a pretty large range.

5              MR. CONNELLY:  Well, it is but where the

6    partners are at the top of the range, and Brewer

7    himself is likely at the top of the range, and it's

8    well -- in 2018, it was well over $1,000 an hour.  But

9    I would go by the case law, Your Honor.  That's why

10   extrinsic evidence isn't required because I know at

11   least three cases we cited that stand for the

12   proposition that $1,000 an hour is reasonable.  There's

13   range given for associates as well.

14       Here's -- I'll just read it for the record.  It's

15   called *Branch of City Bank NA, established in the*

16   *Republic of Argentina v. Dana Vars*, 22 WL 1315587 at

17   *3, Southern District of New York, May 2022, collecting

18   cases.  And they're cases that stand for this same

19   proposition there.  That's cited at page five of our

20   reply.  There the court held that rates are $570 to

21   $665 for associates and $970 to $1,020 for partners

22   were reasonable, and that lines up with the rates over

23   time here in this case.

24       If I can just respond to a couple of other points,

25   Your Honor.  The across-the-board reduction is not

1    warranted here.  We actually discounted the New York

2    rates initially as we do when we're representing

3    individuals.  And when you really look at them and you

4    look at the litigation over, it is not unreasonable and

5    not inequitable.  Again, that's the standard.  It's not

6    is it, quote, reasonable.  It's, Would it be

7    unreasonable and inequitable looking at all of the

8    circumstances to award these fees?  Given everything,

9    the contract itself, the litigation, the proxy war, the

10   fraud claim that Harrison had to defend to clear his

11   name, and the other aspects of it, it's not

12   unreasonable and there's no need for an

13   across-the-board reduction.  And when you really look

14   at those individual entries that they attack, most of

15   them, they're misstating.  It's just classic Redbird

16   style.

17        When you look at the whole entry they are all

18   reasonable.  And if -- there are certainly, if you look

19   at the raw number of timekeepers, there's some partners

20   from GableGotwals, who advised on discrete issues from

21   time to time, and they billed very, very few hours.

22   Very few hours.

23        Again, most of the time in this case was spent by

24   that core team.  There were no shadow billers.  Those

25   additional two other associates came in for that time

1  crutch that I mentioned.

2       I will say counsel for Redbird did -- while he

3  gave the local counsels rate, he did not give us his

4  current billing rate or his billing rate for last year,

5  so I leave it to, Your Honor, if that's relevant.

6       Again, I hit this before, but let me just respond

7  to the specific point.  Counsel said that because we

8  were engaged before, we should not have been engaged

9  for the litigation, but that's the opposite of the

10  truth.  Because we were engaged before, Redbird knew we

11  were there and it would also be unfair to Harrison to

12  make him get totally new counsel for this issue that

13  had arisen when we had analyzed it and were there to

14  defend him for it.

15       And my hope, which to this day hasn't come out, we

16  would be able to resolve the case.  And we did --

17  knowing that there would be significant fee application

18  at the end of this, we tried.  I personally tried

19  multiple times to resolve this case.  Knowing that I

20  would be standing here saying, well, you know, are our

21  fees really for these nearly three years reasonable for

22  all of this?  We did everything that we could to

23  resolve, personal conversations with current counsel,

24  prior counsel, with Mr. Byars, all to no avail.

25       We were trying to cut off these fees a long time

1    ago, and the case never settled.  And even right after

2    this summary jury trial here, we went to the back room

3    and tried to settle the case.  I would say at that

4    point we made incremental progress, but still the case

5    didn't settle.

6        So when, Your Honor, looks at this, again, it's a

7    totality-of-the-circumstance analysis, and under these

8    circumstances it is entirely reasonable to use New York

9    lawyers and to award the fees requested here is

10    certainly not inequitable or unreasonable when Redbird

11    agreed knowingly to reimburse Harrison wholly and

12    completely for his fees.

13        It is certainly while, Your Honor, has the

14    discretion it would be completely within that

15    discretion to say, no, you eyes-wide-open agreed to

16    reimburse wholly and completely.  You brought this

17    case.  You rushed to file.  You didn't even get board

18    approval.  You rushed all to make Brewer, you know --

19    stay in Brewer's good graces.  You're going to pay the

20    fees.  That would be entirely reasonable, Your Honor.

21                THE COURT:  All right.  Thank you.

22                MR. CONNELLY:  Thank you, Your Honor.

23                THE COURT:  Mr. Connelly, I think we have one

24    motion left of yours.

25                MR. CONNELLY:  Yeah.  It's on the bill of

 1    costs.  The big issue there was we followed the local

 2    rule, which said that we could submit either an

 3    affidavit or the records on the bill of costs, and we

 4    laid it out by affidavit.  The clerk only awarded, I

 5    think it's $445 in costs and did so because the initial

 6    submission for the bill of costs did not contain the

 7    records themselves.  We've moved and we have included

 8    the records to cure that issue.  And the total bill of

 9    costs sought is $12,340.35.  And we believe now that

10    the record is -- the records are before you, Your

11    Honor, you can --

12          THE COURT:  It's your position, though, when

13    you submitted them originally you felt like you had

14    sufficient evidence at that time based upon the

15    declaration or affidavit that you submitted pursuant to

16    our local rules?

17          MR. CONNELLY:  Exactly.  That's right, Your

18    Honor.  You know, I realized we haven't talked about

19    the non-taxable costs, and I'm willing to stand on the

20    papers there.  It's straightforward.  We do, in

21    addition to the fees, seek tax -- non-taxable costs

22    that go beyond the bill of costs, but they're in the

23    briefs.

24          THE COURT:  Those are in the briefs.  I

25    reviewed those, and I think we had opposition that was

1    filed to that as well.

2            MR. CONNELLY:  Correct.

3            THE COURT:  I didn't bring that up because I

4    thought it was pretty clear in the briefs.  If you

5    would like to add arguments, I'm fine with that.

6            MR. CONNELLY:  I'll stand on the papes, Your

7    Honor.

8            THE COURT:  Thank you, Mr. Connelly.

9        Mr. Zona.

10           MR. ZONA:  Thank you, Your Honor.

11       The guidelines for the court are very clear.  The

12   declaration that was submitted is a verification

13   statement.  It mirrors what the verification statement

14   is.  A verification statement needs to be included, as

15   well as the explanation for the bill of costs.  The

16   case law here is very, very clear.  Sufficient evidence

17   needs to be on the record before the court so the court

18   can distinguish whether or not the costs being sought

19   are justified as necessary as necessarily -- or for

20   services that were necessarily obtained for trial.

21       That just hasn't been done, nor did Harrison make

22   any attempt to respond to the very clear case law that

23   states that things like color copies are prohibited

24   from a bill of costs, realtime transcription prohibited

25   from bill of costs, the copy of a transcript is

 1    prohibited unless there's some reason for it.  This

 2    court has guidelines that even say that the transcript

 3    cost is prohibited unless the court specifically orders

 4    it or there was a reason that it needed to be

 5    immediately sought.

 6         Other things, like next-day transcripts, which

 7    would go into the depositions, in which next day, I

 8    think two-day service is sought as one of the costs.

 9    We see that when Mr. Harrison finally laid out the

10    actual itemization of cost, which was originally

11    required and was not done.  But even when we see it,

12    when we see those costs broken down and in the papers,

13    this is specifically discussed in both footnotes and

14    the body of the opposition to the motion for review.

15         But it's just plain and simple, Harrison has

16    failed to meet the burden of what this Court requires.

17         The Court cannot make a determination of whether

18    or not services were necessarily obtained unless

19    there's sufficient evidence on the record, and that

20    evidence of the invoice just supports the amount.  It

21    does not support whether or not that service, which

22    generated that cost, was necessarily obtained for

23    trial.

24         Looking at the depositions, most of these

25    depositions weren't even used at trial.  Only the

 1    deposition of Mr. Patel and Mr. Thurman were used

 2    during trial.  And while I believe this Court's

 3    guidelines state that depositions that were necessarily

 4    obtained can be reimbursable, the court law bears out

 5    that a relevant factor to that determination of whether

 6    or not a deposition was necessarily obtained is whether

 7    or not it was used at trial.

 8         So even if this Court were to say that certain of

 9    the depositions -- and it's Redbird's position, be very

10    clear that they were not because Mr. Harrison has

11    failed his burden.  But were this Court to say, okay,

12    there are some of those depositions were necessarily

13    obtained for trial.

14         When we look at what was used at trial, we have

15    two depositions that were used at trial.  Those should

16    be the only two depositions that the Court considers.

17    The other depositions weren't used for trial or they

18    weren't used affirmatively by Mr. Harrison at trial.

19    Which goes into the defense's depositions, right.

20    That's why defense's depositions generally the costs

21    are not recoverable for the defender of that deposition

22    because unless they, you know, use that deposition at

23    trial here, they did not.  Once again, they attempted

24    to use Mr. Harrison's.  They were frustrated in that

25    attempt, so they can't even make a backdoor argument

1    for that being considered by the Court.

2         So just plain and simple, Your Honor, the taxable

3    costs are pretty simple.  A declaration, which should

4    be made, needs to explain the costs.  I mean, that's

5    really what it's there for.  The case law bears this

6    out very clearly.  You need to explain why the costs

7    were necessary, especially here where we have a lot of

8    costs that don't have explanation.  An invoice for

9    printing that still just says what the printing date of

10   it was, but not what it actually was.  Simply as

11   another sentence or a paragraph in a declaration,

12   there's just been an outright refusal to engage that.

13        There shouldn't be allowed a third bite at this

14   apple.  They had two bites.  They knew exactly --

15   Mr. Harrison's counsel knows exactly what the problem

16   was.  It was laid out very, very clearly in the

17   opposition, and in the motion for review it still was

18   not -- it rested on the sufficiency of a verification

19   statement, which is very clearly not what was intended

20   by the local rules.

21        Absent any questions from the Court.

22             THE COURT:  I think that's it.  Thank you.

23             MR. ZONA:  Thank you, Your Honor.

24             MR. CONNELLY:  Can I just very, very quickly?

25             THE COURT:  You may.

1          MR. CONNELLY:  The declaration is sufficient

2    under the local rule, okay.  There is no dispute that

3    the depositions were actually taken and the transcripts

4    were recorded and provided in connection with those

5    depositions.

6          I will correct counsel that at trial, though

7    that's not -- that's not necessary when looking at this

8    that the depositions of Rita Bintliff and Jack

9    Weinstein were also cited and made part of the trial

10   record because there were designations made from them.

11   Counsel did designate from Tom Harrison and then

12   withdraw that designation.  So at the least, he would

13   have to say that that was necessary.

14         But, in any event, when you step back, there's no

15   dispute the costs were incurred, right?  Now, the Court

16   has the bills for them.  These were for depositions.

17   They're for printing costs.

18         It's all before the Court.  The original

19   declaration was sufficient but now you have the

20   records.

21         Thank you, Your Honor.

22         THE COURT:  Counsel, first I would like to

23   thank you for coming here to the Easter District.  I

24   know it's not easy for either one of you coming out

25   here but this is a significant case with significant

UNITED STATES DISTRICT COURT - OFFICIAL TRANSCRIPT

```
 1   potential fees and awards that are out there.  And so I
 2   appreciate both of you coming and making this effort
 3   for an in-person hearing so that you could clarify some
 4   issues for the Court before I issue my final ruling.
 5       I will be taking all three of these under
 6   advisement, and I will get an order out to you very
 7   quickly.  I know that we have another issue that is
 8   pending and we have an order that's probably going to
 9   be going out on that in the very near future.
10       With that being said, is there anything further
11   today, Mr. Connelly?
12           MR. CONNELLY:  Nothing.  If by that you mean
13   you don't need or would not want like to hear anything
14   on the motion to amend.
15           THE COURT:  We don't need any.  We have
16   briefs and the opposition is very clear on the motion
17   to amend.  So we don't need any further argument on
18   that today.
19           MR. CONNELLY:  Okay.  Thank you, Your Honor.
20   Nothing further, then.
21           THE COURT:  Mr. Zona, anything else that you
22   would like to add?
23           MR. ZONA:  No, Your Honor.
24           THE COURT:  Mr. Maloan, Mr. Shores, anything
25   local counsel would like to throw in today?
```

1          MR. SHORES:  Your Honor, I am in a building

2    with electricity and air conditioning, so if we were to

3    extend the hearing, I would not complain.

4          However, I have nothing further at this time as

5    local counsel.

6          THE COURT:  Mr. Shores, you are in the same

7    position as myself and one of my law clerks.  Neither

8    one of us has power right now as well.

9          So I was looking forward to my drive to work today

10   and getting here to the building and seeing electricity

11   and feeling the air conditioner.

12         MR. SHORES:  I was able to charge all of my

13   devices on the drive to the Eastern District this

14   morning.  It was fantastic.

15         THE COURT:  I took a drive with my dogs last

16   night at 9:00 just so I could get my phone charged up

17   and make sure I didn't miss anything.

18         MR. SHORES:  Thank you.

19         THE COURT:  All right.  Thank you.

20        If there's nothing further, again counselors, I

21   appreciate you all coming.  I know it's a long trip and

22   not easy to get here, so thank you.

23        We'll be adjourned.

24             (RECORDING CONCLUDED 11:34 a.m.)

25             **CERTIFICATE OF REPORTER**

1          I certify that the foregoing is a correct
2  transcription from the FTR audio-recorded record of
   proceedings in the above-entitled matter.

3  DATE:    July 18, 2024

4  /S/ Shelley Ottwell, RPR
   Shelley Ottwell, RPR, CSR
5  U.S. STENOGRAPHER

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25