# EXHIBIT B

## LEASE AGREEMENT

THIS LEASE AGREEMENT (this "**Lease**") is made as of the 1st day of July, 2020 (the "**Effective Date**"), by and between **RB REALTYCO LLC**, an Oklahoma limited liability company ("**Landlord**"), and **MARITEQ GROWERS LLC**, an Oklahoma limited liability company ("**Tenant**").

### Recitals:

A.      Landlord is the owner of certain improved real property situated in Adair County, Oklahoma, near Stilwell, Oklahoma, consisting of three (3) tracts of land comprising together 39.95 acres of land, more or less, situated in Adair County, Oklahoma in or near the town of Stilwell, Oklahoma, as more particularly described in Exhibit A hereto attached (the "**Real Estate**"), and the buildings, structures and improvements thereon, including administrative offices, greenhouse, production and warehouse facilities totaling approximately 88,919 square feet of interior rentable space (collectively, the "**Stilwell Facility**");

B.      Tenant desires to obtain from Landlord the right to occupancy and use of a designated portion of the Stilwell Facility, comprising approximately 78,508 sq. ft. as more particularly shown in Exhibit B hereto attached (the "**Leased Premises**").

C.      Landlord desires to lease the Leased Premises to Tenant, and Tenant desires to lease the same from Landlord, upon the terms and conditions hereinafter set forth,

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree to the following terms and conditions of this Lease.

### ARTICLE I
### Leased Premises and Term

**1.1**      **Leased Premises**.  Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, on the terms and conditions herein set forth, the designated Leased Premises.

**1.2**      **Term**.  The term of this Lease shall be five (5) years, commencing on June 1, 2020 (the "**Commencement Date**") and terminating at 11:59 P.M. Central Time on June 30, 2025 (the "**Initial Term**"), with options to renew the term for five (5) consecutive five-year terms (each a "**Renewal Term**", collectively, the "**Renewal Terms**", and together with the Initial Term, the "**Term**"), provided that prior to any Renewal Term (a) Tenant shall not be in default or breach of any term, condition or provision of this Lease, and (b) Tenant shall provide Landlord written notice of its election to renew the Lease not more than one hundred eighty (180) days nor fewer than one hundred twenty (120) days prior to the expiration date of the then-existing term.

## ARTICLE II
## Rent

**2.1    Base Rent**.  The Base Rent payable by Tenant for occupancy and use of the Leased Premises during the Initial Term shall be the sum of $198,656 per month.  The Base Rent payable by Tenant during each Renewal Term shall be the amount determined by a real estate broker acceptable to Landlord and the Tenant to be the "market rate", at commencement of such Renewal Term, for the occupancy and use of similar facilities suitable for use in the planting, cultivation, harvesting, processing and distribution of plants of various kinds for medicinal, pharmaceutical and similar purposes situated within two hundred fifty (250) miles of the Stilwell Facility.

**2.2    Additional Rent: Common Areas; Impositions**.

(a)    Definitions.  As used herein,

(i)    "**Additional Rent**" means all costs and expenses to be paid by Tenant under this Lease, as further set forth in Sections 2.2, 4.2, 5.1 and 5.6.

(ii)    "**CAM Charges**" means all costs and expenses incurred by Landlord to operate, clean, maintain and repair the Common Areas, including but not limited to (A) all Impositions, (B) all insurance attributable to the Common Areas and (C) all utilities not separately metered to and paid by Tenant; provided that CAM Charges shall not include any of Excluded Charges.

(iii)    "**Common Areas**" means any buildings, structures, or portions thereof, other than the Leased Premises, owned by Landlord and comprising part of the Stilwell Facility, whether or not shown in Exhibit B, and all parcels or tracts of land owned by Landlord on which all or any portion of the foregoing items are located and any fixtures, furniture and other personal property owned or leased by Landlord located thereon or therein and used in connection therewith, made available by Landlord from time to time for the general use or benefit of Tenant and other occupants and guests of the Stilwell Facility of which the Leased Premises are a part, as such areas currently exist and as they may be changed from time to time subject to limitations described in this Lease.

(iv)    "**Excluded Charges**" means (A) any cost or expense arising from the replacement of capital investment items or costs of a capital nature; (B) any cost or expense billed to specific tenants of the Building or any other third-party; (C) the cost of repairs or other work to the extent Landlord is reimbursed by insurance or condemnation proceeds; (D) Landlord's general business overhead; (E) any costs, fines or penalties incurred due to violations by Landlord of any applicable law; and (F) Landlord's depreciation and amortization expenses.

(v)    "**Governmental Authority**" means any municipality, county, or state, the United States of America, or any other governmental body, subdivision, agency, or authority.

(vi)    "**Impositions**" means all real estate and *ad valorem* taxes, assessments and associated levies, which shall or may during the Term be

2

assessed, levied or imposed by any Governmental Authority upon (A) the Leased Premises or any part thereof, (B) the Common Areas, and (C) the appurtenances thereto or the sidewalks, parking areas or driveways adjacent thereto or associated with the Stillwell Facility and comprising party thereof; provided that Impositions shall not include any increase therein imposed solely by reason of a change in the ownership of the Leased Premises. Impositions shall not include any income tax, capital levy, estate, succession, or transfer taxes, or similar tax imposed upon and payable by Landlord; any franchise tax imposed upon any owner of the fee of the Leased Premises; or any income, profits, sales, or revenue tax, assessment, or charge imposed by any Governmental Authority upon the Rent or other benefit received by Landlord under this Lease.

(vii)    "**Tenant's Proportionate Share**" means the percentage derived by multiplying (a) the quotient of (i) the total interior floor area of the Leased Premises <u>divided by</u> (ii) the total interior floor area of the building in which the Leased Premises are located and any other buildings included in the Stillwell Facility and which are used for the cultivation, growth, storage, processing or shipment of cannabis and other any other plants or botanical organisms intended or destined for medical various uses as determined by Landlord by (b) 100. Landlord and Tenant hereby agree that Tenant's Proportionate Share is 88.29%. It is further understood by the parties that Tenant's Proportionate Share shall not be subject to revision except in connection with an actual change in the size of the Leased Premises or the Stillwell Facility.

(b)    <u>Tenant's Use of Common Areas</u>.    Tenant and Tenant's employees, customers, patrons, licensees, and invitees may use the Common Areas on a non-exclusive basis in common with all other persons to whom the right to use such Common Areas has been granted by Landlord, or is hereafter granted by Landlord subject to the terms of this Lease.

(c)    <u>Common Area Maintenance</u>.    Landlord shall operate, clean, maintain and repair the Common Areas, and commencing on the Commencement Date, and continuing on the first day of each month thereafter during the Term, Tenant shall pay to Landlord as Additional Rent one-twelfth (1/12th) of Tenant's Proportionate Share of Landlord's estimate of CAM for the then current calendar year.

(d)    <u>Taxes and Assessments</u>.    If the amount of the real estate taxes and assessments for the then calendar year is not be known at the time any such payment is due, Tenant shall pay Landlord, as Additional Rent, Tenant's Proportionate Share of one-twelfth (1/12th) of the real estate taxes and assessments for the preceding calendar year and upon ascertaining the real estate taxes and assessments for the current calendar year, Tenant shall pay Landlord any difference upon demand, or if Tenant shall be entitled to a credit, Landlord shall credit the excess against the next monthly installment(s) of Additional Rent as the same shall be due, or paid in full to Tenant if at the end of the Term. Additional Rent based upon real estate taxes and assessments payable for the first and last years of the Term shall be adjusted and pro-rated, so that Landlord shall be responsible for Landlord's pro-rated share for the period prior to and subsequent to the Term, and Tenant shall pay Landlord its pro-rated share for the Term. Provided this

3

Lease is not previously cancelled or terminated, and there shall be no Event of Default, or an event that, with the giving of notice or the lapse of time, or both, would constitute an Event of Default, then, Tenant shall have the right to contest the amount or validity of any real estate tax or assessment assessed and levied against the Leased Premises, or to seek a reduction in the valuation of the Leased Premises as assessed for real estate tax purposes, by appropriate proceedings diligently conducted in good faith (the "**Tax Appeal**"), but only after payment to Landlord of Tenant's Proportionate Share of such taxes and assessments. Except as set forth below, Landlord stall not be required to join in any Tax Appeal. If required by law, Landlord shall, upon written request of Tenant, join in the Tax Appeal or permit the Tax Appeal to be brought in Landlord's name, and Landlord shall reasonably cooperate with Tenant, at the cost and expense of Tenant. Tenant shall pay any increase that may result in real estate taxes or assessments as a consequence of the Tax Appeal, which payment obligations shall survive the expiration or earlier termination of this Lease.

(e)     Additional Rent for Assessments for Public Improvements. As Additional Rent, Tenant shall pay Landlord, on demand, all assessments for public improvements assessed and levied against the Leased Premises. If any assessment for public improvements shall be payable in installments, Landlord shall pay such assessment in the maximum number of installments permitted by law, and Tenant's obligation to pay Additional Rent shall be limited to each such installment due and payable with respect to the Term.

(f)     CAM Statement. Within ninety (90) days after the end of each calendar year, Landlord shall provide Tenant with a statement ("**CAM Statement**") setting forth the total CAM Charges for such calendar year and Tenant's Proportionate Share thereof. Within thirty (30) days after the delivery of such CAM Statement, Tenant shall pay to Landlord any deficiency between the amount shown as Tenant's Proportionate Share of the applicable CAM Charges for such calendar year and the estimated payments made by Tenant toward such amount in accordance with Section 5(d) above. If Tenant shall have made excess estimated payments, the excess shall be applied against estimated payments of CAM for the then-current Lease Year, unless the Lease shall have expired or been terminated, in which event Landlord shall refund such excess to Tenant with the delivery of the CAM Statement. If the CAM payments made by Tenant shall have been insufficient to cover Landlord's actual CAM for the calendar year, the deficiency shall be prorated and added to estimated payments of CAM for the then-current Lease Year, unless the Lease shall have expired or been terminated, in which event Tenant shall pay such deficiency within ninety (90) days after such termination or expiration. If the Commencement Date falls on a day other than the first day of a calendar year, or the Term ends on a day other than the last day of a calendar year, then Tenant's Proportionate Share of CAM for any such calendar year shall be determined by multiplying the amount of Tenant's Proportionate Share for the full calendar year by a fraction, the numerator of which is the number of days during such Lease Year falling within the Term and the denominator of which is 365.

(g)     Audit. Tenant shall have the right, following written notice to Landlord, to audit Landlord's books and records (such right shall include the right to review and copy such books and records) relating to the CAM for the immediately preceding

4

calendar year, provided that the conduct of such audit must not unreasonably interfere with the conduct of Landlord's business. Unless Landlord in good faith disputes the results of such audit, an appropriate adjustment shall be made between Landlord and Tenant to reflect any overpayment or underpayment of Tenant's proportionate share of the CAM within thirty (30) days after delivery of such audit to Landlord. In the event Landlord in good faith disputes the results of any such audit, the parties shall in good faith attempt to resolve any disputed items. If the parties are unable to resolve any such dispute, any sum on which there is no longer dispute shall be paid and any remaining disputed items shall be referred to a mutually satisfactory third party certified public accountant for final resolution. The cost of such certified public accountant shall be paid by the party found to be least accurate (in terms of dollars in dispute). The determination of such certified public accountant shall be final and binding and final settlement shall be made within thirty (30) days after receipt of such accountant's decision.

(h)    _Additional Rent for Late Payment._ In the event Tenant defaults for more than five (5) days in the payment of monthly installments of Base Rent, any Additional Rent, or any of the sums required of Tenant under this Lease, or if Tenant fails to reimburse Landlord for any expenses incurred by Landlord pursuant to this Lease, together with interest, then, after ten (10) days' written notice to cure, Tenant shall pay Landlord, as Additional Rent, a late charge in the amount which is five percent (5%) of the unpaid Base Rent, Additional Rent or other expense.

(i)    _Additional Rent for Nonpayment._ If Tenant shall fail after applicable notice and cure periods to comply with or to perform any of the terms or conditions of this Lease, Landlord may (but with no obligation to do so) carry out and perform such terms or conditions, at the expense of Tenant, which expense shall be payable by Tenant, as Additional Rent, within ten (10) days after receipt of written demand of Landlord for reimbursement of such expenses, together with interest at the eighteen percent (18%) _per annum_ (the "**Default Rate**") until paid, which interest shall accrue from the date of Landlord's demand.

(j)    _Additional Rent Based Upon Landlord's Legal Expenses in Enforcing Lease._ As Additional Rent, Tenant shall pay Landlord, all reasonable attorneys' fees that may be incurred by Landlord in enforcing Tenant's obligations under this Lease; provided, however, that in the event Landlord commences a suit against Tenant to enforce Tenant's obligations under this Lease, and such suit is tried to conclusion and judgment is entered in favor of Tenant, then, in that event Tenant shall not be under any obligation to pay the associated attorneys' fees that Landlord may have incurred.

(k)    _Additional Rent for New Taxes Based on Rent._ If at any time during the Term pursuant to any future law a tax or charge shall be imposed by the State of Oklahoma or the county or municipality in which the Leased Premises are located, which tax or charge shall be based upon the rent due or paid by Tenant to Landlord, then, Tenant shall pay Landlord, as Additional Rent, the amount of such tax or charge. The foregoing shall not require payment by Tenant of any income taxes assessed against Landlord or of any capital levy, franchise, succession, or transfer tax payable by Landlord.

**2.3**    **Net Lease**. Except as otherwise provided herein, it is the intention of the parties

that this Lease be a "triple net lease", and Landlord shall receive the Base Rent, Additional Rent and other sums required to be paid by Tenant hereunder, undiminished by any cost, expense or obligation of any kind or character relating to Tenant's occupancy and use of the Leased Premises, which shall arise or become due during the Term, all of which shall be paid by Tenant in accordance with the provisions of this Lease.

**2.4** **No Setoff**. Except as otherwise provided herein, Tenant shall pay Landlord all Base Rent, Additional Rent and other sums required of Tenant under this Lease without abatement, deduction or setoff and irrespective of any claim Tenant may, at any time, have against Landlord.

**2.5** **Application**. No payment by Tenant or receipt by Landlord of an amount less than the Base Rent, Additional Rent, or other sums required to be paid by Tenant under the Lease, shall be deemed anything other than a payment on account of the earliest Base Rent, Additional Rent, or other sums due from Tenant under the Lease. No endorsements or statements on any check for the payment of Base Rent, Additional Rent, or other sums required to be paid by Tenant under the Lease shall be deemed to be an accord and satisfaction by Landlord. Landlord may accept any check for payment from Tenant without prejudice to Landlord's right to recover the balance of Base Rent, Additional Rent, or other sums required of Tenant under the Lease or to pursue any other right or remedy provided by this Lease or applicable law.

**2.6** **Deferral of Rent.** Due to Tenant's current status as an upstart, the constraint's on Tenant's cash flow due to being in the formative stages of its business, and the need to conserve and apply existing and available capital toward important growth strategies and strategic implementations, Landlord and Tenant mutually agree to defer Tenant's payment of Base Rent, Additional Rent and other amounts due under the terms of this Lease (the "**Deferred Rent**") for a period of up to thirty (30) months (the "**Deferment Period**"). Deferred Rent as set forth in this paragraph shall accrue interest at the rate of twelve (12%) per annum, compounded monthly. The Deferred Rent, together with any accrued and unpaid interest, shall be due on the first business day of December 31, 2022.

**2.7** **Late Charges.** If Base Rent, Additional Rent or any other amount payable by Tenant hereunder (other than Deferred Rent amounts) is not paid within thirty (30) business days after the due date for such payment, such unpaid amount shall accrue interest from the date on which such payment was due at the rate of Default Rate until paid.

**ARTICLE III**
**Use, Care, Maintenance and Repair**

**3.1** **Use of Leased Premises**. The Leased Premises shall be used and occupied by Tenant for a medical marijuana growing or processing facility and any business ancillary thereto ("**Permitted Use**"). Tenant shall not use or permit the Premises or any part thereof to be used in any manner that constitutes waste or nuisance or for any disorderly, unlawful or hazardous purpose, specifically 63 O.S. Section 420A, et seq. and Oklahoma Administrative Code Section 310:681, *et seq*. Tenant, at Tenant's expense, shall comply with all laws, rules, orders, ordinances, directions, regulations, and requirements of governmental authorities with jurisdiction over the Lease Premises, Tenant or Tenant's operations. Tenant represents that it has

6

or will obtain a medical marijuana grower's license ("**MM License**") and shall lawfully maintain such MM License during the term of the Lease, including any renewals hereof, in accordance with all applicable requirement of the Oklahoma Medical Marijuana Authority ("**OMMA**") and the provisions of Oklahoma State Question 788, as codified at 63 Okla. Stat. §420 *et seq*. and 63 Okla. Stat. §426.1; the Oklahoma Medical Marijuana and Patient Protection Act, codified at 63 Okla. Stat. §427.1 *et seq*.; and the Oklahoma Medical Marijuana Waste Management Act, codified at 63 Okla. Stat. §427a *et seq*. In the event Tenant's MM License shall be terminated or is not renewed the Tenant's Use of the premises as a medical marijuana grow facility shall cease immediately without abatement of rent for a period of two (2) months thereafter.

    **3.2**    **Condition and Care of the Leased Premises**. TENANT HEREBY ACCEPTS THE LEASED PREMISES "AS IS," WITH NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, BY LANDLORD AS TO THE CONDITION THEREOF. Tenant shall take good care of the Leased Premises and keep the same neat, clean and free from trash or rubbish at all times. Tenant shall not commit or allow waste to be committed on the Leased Premises, and Tenant shall not allow any hazardous activity to be engaged in upon the Leased Premises. Tenant shall not cause or allow any nuisance to exist on or within the Leased Premises. Tenant shall fully comply with any requirements or notice from any governmental authority having jurisdiction over the Leased Premises in connection with Tenant's use and occupancy thereof, and agrees to indemnify and hold Landlord harmless from any penalties, fines, costs or damages resulting from its failure to do so. During the Term, in addition to the Base Rent and Additional Rent herein provided, Tenant agrees to pay all costs and charges for repair and maintenance of the Leased Premises, except as otherwise provided herein. Tenant agrees to surrender the Leased Premises at the expiration or earlier termination of this Lease in as good condition at the commencement of Tenant's occupancy except Tenant shall not be responsible for the repair or condition of those portions or components of the Leased Premises that Landlord agrees to maintain and repair, nor for damage by dry rot, termites, sinking of floors, or ordinary wear and tear. Landlord will assist Tenant when a manufacturer or supplier is obligated to make or pay for the repairs or maintenance under an expressed or implied warranty.

    **3.4**    **Landlord's Maintenance Obligations**. In addition to CAM as hereinabove provided (to include lawn care and snow and ice removal of the parking areas, driveways and walkways surrounding the Leased Premises), Landlord shall be responsible for performing, at Landlord's own expense, all repairs to the roof, foundation and exterior walls of the Leased Premises, exterior plumbing and wiring, and other structure portions of the Stillwell Facility and all Common Areas.

**ARTICLE IV**
**Improvements and Utilities**

    **4.1**    **Improvements**. Tenant shall not make any improvements or alterations to the Leased Premises or begin any construction on the Leased Premises without the prior written consent of Landlord, which consent may be withheld or conditioned in Landlord's sole discretion. Tenant shall bear all costs of any permitted construction on the Leased Premises and hereby agrees that any contractors or subcontractors Tenant hires to construct any improvements or make any alterations to the Leased Premises will be licensed and insured and approved by Landlord prior to the commencement of any construction. Tenant covenants that all such work

7

shall be carried out in accordance with the requirements, orders and limitations of all local, state or federal departments or bureaus having jurisdiction, and upon completion, the Leased Premises shall be in compliance with all governmental requirements for the use which the Tenant may make of them.

**4.2** **Utilities**.  Tenant shall arrange for, and shall promptly pay as and when due, all charges for electricity, water, gas, telephone service, sewer, internet service, and other utilities furnished to the Leased Premises during the Term; provided that Landlord may, if so elects, furnish one or more utility services to Tenant, and in such event Tenant agrees to pay to Landlord its share of all charges for utility services supplied to the Leased Premises for which there is no separate meter or sub-meter upon billing by Landlord of Tenant's share, as reasonably determined by Landlord based upon estimated actual usage.  Landlord may at any time discontinue furnishing any such service without obligation to Tenant other than to connect the Leased Premises to the public utility, if any, furnishing such service.  Landlord shall not be liable for any interruption in utility services whatsoever, and Tenant acknowledges that Landlord shall have no liability for any failure or interruption of any utility or service resulting from government imposed restrictions, or utility "blackouts" resulting from a usage overload on the state, county or city electrical grid, and Tenant shall have no right to a reduction or abatement of Base Rent, Additional Rent or any other sums due hereunder in connection with an interruption of any utility or service.

**4.4** **Signage**.  Tenant shall have the right to install, at Tenant's expense, signage in such form and at such locations on the Leased Premises as Landlord shall deem appropriate.  Each such sign Tenant installs shall at all times conform to all applicable rules, regulations, codes and ordinances of any governmental agency with jurisdiction.  At the termination of this Lease, all such signs shall be removed, at Tenant's own expense.

**4.5** **Removal**.  Subject to Tenant's obligation to remove signs at the termination of this Lease pursuant to Section 4.4, any addition to or alteration of the Leased Premises shall be deemed a part thereof and shall belong to Landlord at the expiration of the Term.  Landlord shall bear no obligation to reimburse Tenant for the costs and expenses of any alterations and improvements.

**4.6** **Discharge of Liens**.  Tenant shall not create or permit to be created or to remain, and will promptly discharge, any lien, encumbrance or charge (including without limitation any mechanic's, laborer's or materialman's lien) against the Leased Premises or any part thereof arising from Tenant's actions and if any such mechanic's, laborer's or materialman's lien shall at any time be filed against the Leased Premises or any part thereof, Tenant shall cause the same to be discharged of record by payment, deposit, bond, order of a court of competent jurisdiction, or otherwise.  If Tenant shall fail to effect such discharge within thirty (30) days from notice provided by Landlord, then, in addition to any other available right or remedy, the Landlord may, but shall not be obligated to, discharge the same either by paying the amount claimed to be due or by procuring discharge by deposit or by bonding proceedings, all in accordance with applicable.  Tenant shall pay all costs and expenses incurred by Landlord in connection therewith, together with interest thereon at the Default Rate from the date such costs and expenses were incurred.

8

## ARTICLE V
## Insurance and Indemnification

**5.1** **Fire & Casualty Insurance**. During the Term, Landlord shall obtain and keep in force an all-risk insurance policy covering the Stilwell Facility and all improvements located thereon in an amount of one hundred percent (100%) of the replacement value of the buildings and all improvements on the Stilwell Facility, and with such deductible as Landlord considers appropriate in Landlord's sole discretion. Commencing with the Rent Commencement Date and through the expiration of the Term, as Additional Rent, Tenant agrees to pay Tenant's Proportionate Share of premiums for such insurance as a CAM. Tenant acknowledges that it shall not be entitled to receive any proceeds from such insurance property, that Landlord shall not have any obligation to carry insurance of any kind on any of Tenant's furniture or furnishings or any of Tenant's fixtures, equipment or improvements to the Leased Premises and that Landlord shall have no obligation to repair any damage to, or replace any of Tenant's furniture, fixtures, equipment or improvements.

**5.2** **Liability Insurance**. During the Term, Landlord shall carry commercial general liability insurance with respect to the Building and Common Area, with limits of not less than One Million Dollars ($1,000,000) with respect to bodily injury or death to any number of persons in any one accident or occurrence and with respect to property damage in any one accident or occurrence, and Two Million Dollars ($2,000,000) annual aggregate and Tenant shall, at Tenant's own expense, obtain and keep in force Commercial general liability insurance and personal injury liability insurance, insuring Tenant against liability for injury to persons or damage to property occurring in or about the Leased Premises or arising out of the ownership, maintenance, use or occupancy thereof. The minimum acceptable limits of liability are, as follows: One Million Dollars ($1,000,000) with respect to bodily injury or death to any number of persons in any one accident or occurrence and with respect to property damage in any one accident or occurrence, and Two Million Dollars ($2,000,000) annual aggregate. This insurance shall also name Landlord, and its mortgagees, if any, and their respective members, managers, shareholder, directors, officers, employees, agents and representatives as additional insureds.

**5.3** **Worker's Compensation**. During the Term, Tenant shall, at Tenant's own expense, obtain and keep in force workers' compensation and employer's liability insurance as required by applicable law.

**5.4** **Other Insurance Policies**. During the Term, Tenant shall, at Tenant's own expense, obtain and keep in force business interruption or loss of income insurance in amounts sufficient to insure Tenant's business operations for a period of not less than one (1) year, and property insurance covering all of Tenant's personal property, inventory, fixtures, equipment, improvements and furnishings; and any other insurance coverages that Landlord or Landlord's mortgagees may reasonably require.

**5.5** **Insurance Applicable Law**. Tenant shall also name Landlord (and Landlord's mortgagees, if any) an additional insured with respect to any insurance policies and shall provide Landlord or its designees upon written request with certificates of insurance or copies of insurance policies evidencing that insurance satisfying the requirements of this Lease is in effect

{00674359-5}

at all times.  All insurance policies shall provide that coverage may not be canceled or reduced without at least thirty (30) days written notice first being given to Landlord.  If Tenant shall fail to procure and maintain the insurance required hereunder, Landlord may procure and maintain the same (but shall not be required to do so), and any amounts paid by Landlord for such insurance shall be Additional Rent, which shall be due and payable to Landlord on the next succeeding date on which Base Rent is due.

**5.6**     **Increase in Premiums**.  Tenant shall not, without Landlord's prior written consent, keep anything within the Leased Premises for any purpose that increases the insurance premium cost or invalidates any insurance policy carried on the Leased Premises or the Stilwell Facility, and Tenant shall pay upon demand of Landlord, as Additional Rent any premium increases resulting from Tenant's breach of this provision.     All property kept, stored or maintained within the Leased Premises by Tenant shall be at Tenant's sole risk.

**5.7**     **Insured Loss; Waiver of Subrogation**.  Landlord and Tenant agree and covenant that neither shall be liable to the other for loss arising out of damage to or destruction of the Leased Premises or contents thereof when such loss is caused by any perils included within the all-risk insurance policy.  This provision shall be binding whether or not such damage or destruction is caused by negligence of either party or their respective members, managers, officers, employees, agents, representatives, guests of invitees.  Landlord and Tenant each waive any rights each may have against the other on account of any loss or damage occasioned to Landlord or Tenant, as the case may be, their respective property, the Stilwell Facility, the Leased Premises, or its contents.  The insurance policies obtained by Tenant pursuant to this Lease shall contain endorsements waiving any right of subrogation which the insurer may otherwise have against Landlord.

**5.8**     **Indemnification**.  Except for the negligence of Landlord, Tenant shall indemnify and hold Landlord, its members, managers, officers, employees, agents and representatives, harmless from and against any and all claims, demands, causes of action, suits, proceedings, liabilities, damages, losses, costs and expenses, including attorney's fees, caused by, incurred or resulting from Tenant's occupancy or use of the Leased Premises, by Tenant or any of its guests or invitees, and also including claims for wrongful, death, or injury to persons or property on the Leased Premises or in the Common Areas.  Tenant shall also indemnify and hold harmless Landlord from and against damages or losses Landlord incurs as a result of (a) any violation of the Controlled Substances Act, as codified at Section 812 *et seq.* of Title 21 of the United States Code and/or (b) damage done to the Premises as a result of robberies, break-ins and burglaries, as well as any federal forfeiture.  It is expressly understood that Tenant's obligation under this Section 5.8 shall survive the expiration or earlier termination of this Lease for any reason.

## ARTICLE VI
### Compliance with Laws

**6.1**     **General Compliance with Applicable Law**. Except as provided herein, Tenant's use of the Leased Premises shall comply with each and every applicable State of Oklahoma, county and municipal statute, ordinance, code, rule, regulation, order, directive or requirement, currently or hereafter existing , together with all amending and successor federal, State of

10

Oklahoma, county and municipal statutes, ordinances, codes, rules, regulations, orders, directives or requirements ("**Applicable Law**"), including, but not limited to, the Americans with Disabilities Act of 1990 ("**ADA**") and all environmental laws. The failure to mention any specific statute, ordinance, rule, code, regulation, order, directive or requirement shall not be construed to mean that Tenant was not intended to comply with such statute, ordinance, rule, code, regulation, order, directive or requirement. Because compliance with the ADA is dependent upon Tenant's specific use of the Leased Premises, Landlord makes no warranty or representation as to whether or not the Leased Premises complies with the ADA or any similar legislation. If, at any time during the Term, modifications or additions are required to be made in order for the Leased Premises to be in compliance with the ADA, Tenant hereby agrees to make such modifications and/or additions at Tenant's own expense.

**6.2**   **Environmental Compliance**. Tenant's use of the Leased Premises shall comply with all Hazardous Materials Laws, and all regulations of the Oklahoma Medical Marijuana Authority, and the Oklahoma Bureau of Narcotics and Dangerous Drugs.

(a)   Suspected Violations. If any Environmental Activities occur or are suspected to have occurred in violation of any Hazardous Materials Laws by Tenant during the Term or if Tenant has received notice of any Hazardous Materials Claim against any portion of the Leased Premises as a result of Tenant's acts or omissions during the Term, Tenant shall promptly obtain all permits and approvals necessary to remedy any such actual or suspected problem through the removal of Hazardous Materials or otherwise, and upon Landlord's approval of the remediation plan, remedy any such problem to the reasonable satisfaction of Landlord and all applicable governmental authorities, in accordance with all Hazardous Materials Laws and good business practices.

(b)   Notice. During the Term, Tenant shall promptly advise Landlord in writing of (i) any Environmental Activities in violation of any Hazardous Materials Laws; (ii) any Hazardous Materials Claims against Tenant or any portion of the Leased Premises; (iii) any remedial action taken by Tenant in response to any Hazardous Materials Claims or any Hazardous Materials on, under or about any portion of the Leased Premises in violation of any Hazardous Materials Laws; (iv) Tenant's discovery of any occurrence or condition on or in the vicinity of any portion of the Leased Premises that materially increases the risk that any portion of the Leased Premises will be exposed to Hazardous Materials; and (v) all written communications to or from Tenant, any governmental authority or any other Person relating to Hazardous Materials Laws or Hazardous Materials Claims with respect to any portion of the Leased Premises, including copies thereof.

(c)   Proceedings. Landlord shall have the right, at Tenant's sole cost and expense (including, without limitation, Landlord's reasonable attorneys' fees and costs) and with counsel chosen by Landlord, to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any Hazardous Materials Claims. Landlord represents and warrants to Tenant that to Landlord's knowledge, without inquiry or investigation, there are no pending claims or causes of action arising

11

out or relating to the Stilwell Facility or the Leased Premises as of the Commencement Date. Tenant shall not have any obligations or liabilities with respect to any existing conditions or matters relating to the Stilwell Facility or the Leased Premises as of the Commencement Date.

(d)    Defined Terms.  As used herein,

(i)    "**Environmental Activities**" means the use, generation, transportation, handling, discharge, production, treatment, storage, release or disposal of any Hazardous Materials at any time to or from any portion of the Premises or located on or present on or under any portion of the Premises.

(ii)    "**Hazardous Materials**" means (A) any petroleum products and/or by-products (including any fraction thereof), flammable substances, explosives, radioactive materials, hazardous or toxic wastes, substances or materials, known carcinogens or any other materials, contaminants or pollutants which pose a hazard to any portion of the Premises or to Persons on or about any portion of the Premises or cause any portion of the Premises to be in violation of any Hazardous Materials Laws; (B) asbestos in any form which is friable; (C) urea formaldehyde in foam insulation or any other form; (D) transformers or other equipment which contain dielectric fluid containing levels of polychlorinated biphenyls in excess of fifty (50) parts per million or any other more restrictive standard then prevailing; (E) medical wastes and biohazards not disposed of in accordance with applicable law; (F) radon gas; and (G) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any governmental authority or may or could pose a hazard to the health and safety of the occupants of any portion of the Premises or the owners and/or occupants of property adjacent to or surrounding any portion of the Premises, including, without limitation, any materials or substances that are listed in the United States Department of Transportation Hazardous Materials Table (49 CFR 172.101) as amended from time to time.

(iii)    "**Hazardous Materials Claims**" means any and all enforcement, clean up, removal or other governmental or regulatory actions or orders threatened, instituted or completed pursuant to any Hazardous Material Laws, together with all claims made or threatened by any third party against any portion of the Premises, Lessor or Lessee relating to damage, contribution, cost recovery compensation, loss or injury resulting from any Hazardous Materials.

(iv)    "**Hazardous Materials Laws**" means any laws, ordinances, regulations, rules, orders, guidelines or policies relating to the environment, health and safety, Environmental Activities, Hazardous Materials, air and water quality, waste disposal and other environmental matters.

# ARTICLE VII
## Casualty

**7.1**    **Total Destruction**.  In the event of a total destruction of the Leased Premises during the term hereof from any cause, or partial destruction of such a nature as to render the

12

whole of the Leased Premises substantially unfit for Tenant's use, except as hereinafter immediately set forth, this Lease shall automatically terminate as of the date of such damage or destruction, and Tenant shall surrender the Leased Premises and all interests therein to Landlord, with the remainder of Tenant's unearned rental obligations abating as of the date of total surrender. Notwithstanding the foregoing sentence, Landlord retains the right, in its sole election to restore the Leased Premises to substantially the condition as existed prior to the occurrence of such casualty. Landlord shall notify Tenant in writing of its election to restore the Leased Premises within sixty (60) days after the date on which the damage occurred. Landlord's election to restore the Leased Premises shall operate to keep this Lease in full force and effect, but pending restoration of the Leased Premises any rent payable by Tenant shall abate until restoration of the Leased Premises is substantially complete. The term of this Lease shall then be extended for the time it took to substantially restore the Leased Premises.

7.2    **Partial Destruction**. If the Leased Premises shall be partially destroyed by casualty, but not rendered entirely unfit for Tenant's use, then, this Lease shall continue in full force and effect, with the rent payable hereunder abated in proportion to the part of the Leased Premises that is unusable by Tenant, until such time as Landlord shall effect and substantially complete repairs. Once repairs are substantially complete, any partial abatement of rent shall cease, and Tenant shall once again pay the full amount of all rentals subsequently due hereunder. A partial destruction of the Leased Premises which does not substantially impair Tenant's use thereof shall in no way annul or void this Lease or result in any abatement of rent for the benefit of Tenant.

7.3    **Notice of Casualty**. If the improvements situated upon the Leased Premises shall be damaged or destroyed at any time, whether covered by insurance or not, Tenant shall give prompt notice thereof to Landlord.

7.4    **Entry and Inspection**. Tenant shall permit Landlord and its agents to enter the Leased Premises at all reasonable times to inspect the same and to make such repairs as Landlord may elect to make. Landlord shall have such right to do so without any rebate of rent to Tenant for any loss of occupancy or quiet enjoyment of the Leased Premises thereby occasioned. In addition, Landlord shall have the right to enter the Leased Premises at any reasonable time within one hundred eighty (180) days of any forthcoming termination hereof for the purpose of offering and showing the Leased Premises for sale or lease to third parties.

**ARTICLE VIII**
**Eminent Domain**

8.1    **Substantial Taking**. If, during Term, title to the whole, or Substantially All, of the Leased Premises (as hereinafter defined) shall be taken in a condemnation proceeding or by any right of eminent domain, then and in that event, this Lease shall terminate on the date of such taking and the Base Rent and all Additional Rent shall be apportioned and paid to the date of such taking. For purposes of this Section 8.1, "**Substantially All**" of the Leased Premises shall be deemed to have been taken if, and only if, in Tenant's reasonable judgment so much of the Leased Premises is taken as to make the remainder uneconomic for the Permitted Uses. Landlord shall advise Tenant in writing promptly after Landlord is notified, verbally or in

13

writing, of any action or proceeding of condemnation or exercising by any Governmental Authority of its right of eminent domain. If Tenant desires for this Lease to terminated by reason of its determination that Substantially All of the Leased Premises has been, or is being, taken, Tenant shall give Landlord written notice of such determination within thirty (30) days after Tenant is advised of the taking.

      **8.2**    **Partial Taking**. If, during Term, title to a portion of the Leased Premises, but less than Substantially All thereof, shall be taken in a condemnation proceeding or by any right of eminent domain (a "**Partial Taking**"), then and in that event, this Lease shall continue in effect as to the remainder of the Leased Premises. Following such Partial Taking, Tenant shall make all repairs or alterations to the remaining Leased Premises which shall be necessary to make the remaining portions of the Premises an architectural whole. Landlord shall make all repairs or alterations to the Common Areas, which shall be necessary to make the remaining portions of the Leased Premises accessible, such repairs and alterations to be made using materials similar to those comprising the remaining portions of the Common Areas and in such a manner as to make the Leased Premises and Common Areas usable, as nearly as practicable, to the manner in which they were used to prior to such Partial Taking. The Base Rent and Additional Rent subsequently payable hereunder during the unexpired portion of the Lease shall be reduced proportionately to the rentable area of the Leased Premises taken, effective on the date physical possession is taken by the condemning authority.

      **8.3**    **Compensation to Landlord**. In the event of a Partial Taking, the entire award of damages or compensation for the property taken or condemned shall belong to and be the property of Landlord, and Tenant hereby assigns to Landlord any and all such award or compensation; provided that in the event of the whole or Substantially All of the Leased Premises shall be taken, the rights and interests of the Landlord and Tenant in and to the entire award including interest or the aggregate of any separate awards made by the court or otherwise, after payment of all reasonable fees and expenses incurred by both parties in connection with the establishing and collection of such awards, shall be payable to the Landlord and Tenant as apportioned by the court.

### ARTICLE IX
### Assignment and Subletting

      **9.1**    **Assignment By Tenant**. Tenant shall not assign or sublease any rights under this Lease to any third party without the prior written consent of Landlord, which such consent may be withheld or conditioned in Landlord's sole discretion. This prohibition includes an assignment or subletting to or by a receiver or trustee in any federal or state insolvency or other similar proceeding. Any such an assignment or subletting shall be only to an assignee or sub-tenant that is duly licensed, pursuant to the OMMA, to operate a medical marijuana growing or processing facility, or ancillary activity. Tenant may, upon Landlord's consent, permit the use of the Premises by, assign this Lease to, or sublet the Premises or any part thereof to any entity which (a) is directly or indirectly controlled by, in control of, or under common control with Tenant, (b) acquires all or part of Tenant, (c) is acquired in whole or part by Tenant, (c) results from a merger or consolidation with Tenant, or (d) purchases all or substantially all of Tenant's assets located at, or the business conducted by Tenant in and from, the Leased Premises. Any

{00674359-5}

such transfer of ownership must first be approved by OMMA.  Regardless of Landlord's consent, no assignment or subletting shall release Tenant from this Lease and Landlord's consent to one assignment or subletting shall not be deemed a consent to any subsequent assignment or subletting.  Notwithstanding the foregoing, Tenant may assign this Lease to an affiliate or subsidiary of Tenant provided that (i) Tenant shall provide at least thirty (30) days prior written notice to Lessor of such assignment and shall remain liable for all obligations of the lessee hereunder, and (ii) if approval of such assignment is required by a mortgagee of the Stilwell Facility, such approval shall have been obtained.

 **9.2** **Assignment By Landlord; Attornment**.  Landlord may assign any or all of its rights under this Lease to any third party, without Tenant's consent, and Tenant shall attorn and be bound to any of Landlord's successors and assigns.  If Landlord or any successor owner shall sell or transfer any portion of the Leased Premises, each shall be thereupon released from all future liabilities and obligations hereunder first arising or accruing from and after the date of such sale, transfer or other conveyance, which liabilities and obligations thereupon be binding upon the new owner/transferee.

 **9.3** **Subordination**.  This Lease shall be subordinate to the lien of any mortgage or the lien resulting from any other method of financing or refinancing now or hereafter in force against the Stilwell Facility, or any portion thereof, and to any and all advances to be made under such mortgages and all renewals, modifications, extensions, consolidations and replacements thereof.  The aforesaid provisions shall be self-operative and no further instrument shall be required to evidence such subordination.  Tenant covenants and agrees to execute and deliver upon demand such further instruments subordinating this Lease on the foregoing basis to the lien of any such mortgage or mortgages as shall be desired by Landlord and any mortgagees or proposed mortgagees and, further, hereby irrevocably appoints Landlord as Tenant's attorney-in-fact to execute and deliver such instruments.  If requested by Tenant, Landlord shall obtain from any lender holding a lien on the Leased Premises, a Subordination, Non-Disturbance and Attornment Agreement for the benefit of Tenant, in form and substance reasonably acceptable to Tenant.

 **9.4** **Estoppel Certificate**.  In the event of any sale, assignment or hypothecation of the Leased Premises by Landlord, Tenant agrees to deliver to Landlord or any proposed purchaser or mortgagee, upon request, a certificate stating (a) that this Lease is unmodified and in full force and effect (or, if it has been modified, that it is in full force and effect, as modified, and describing any modifications), (b) that there are no defenses or offsets to its performance, (c) the dates to which Base Rent and Additional Rent have been paid, and (d) that there is in existence no breach or default of this Lease or, if there is, describing the nature of each such breach or default.

**ARTICLE X**
**Enjoyment and Occupancy**

 **10.1** **Quiet Enjoyment**.  So long as Tenant shall pay Base Rent, Additional Rent and all other sums due from Tenant under the Lease and shall keep and perform all of the terms, covenants, obligations and conditions on its part herein contained, Landlord covenants that,

15

subject to Landlord's rights herein, Tenant shall have the right to the peaceful and quiet occupancy and use of the Leased Premises.

**10.2  Occupancy and Abandonment**.  Tenant agrees not to vacate or abandon the Leased Premises at any time during the Term.  Should Tenant vacate or abandon the Leased Premises or be dispossessed by process of law or otherwise, such abandonment, vacation or dispossession shall be a breach of this Lease and, in addition to any other rights which Landlord may have, Landlord may remove any personal property belonging to Tenant which remains on or about the Leased Premises and store the same, for the account of Tenant.  Further, Landlord may proceed to dispose of said personal property either by public or private sale after posting notice of its intent to sell such property for five (5) days upon the front door of the Leased Premises.  It is agreed that Landlord may be the purchaser of all or a portion of such personal property at such sale.  Tenant may redeem said property at any time prior to sale or other disposition thereof upon full payment to Landlord of the reasonable expenses incurred by Landlord in taking, holding and preparing the property for sale and of any amount due from Tenant to Landlord for rent or otherwise.  Should said property be disposed of by sale or other means, the proceeds shall be applied to satisfy any amount due from Tenant to Landlord for rent or otherwise, and to the reasonable expenses incurred for taking, holding and disposing of said property.

## ARTICLE XI
## Default and Remedies

**11.1  Default**.  Each of the following events shall be deemed a breach of this Lease and a default by Tenant (each an "**Event of Default**"):

(a)  Nonpayment.  Tenant's failure to pay any Base Rent or Additional Rent when due or Tenant's failure to pay when due any other sum payable by Tenant to Landlord hereunder within ten (10) days after Tenant shall have been given a written notice by Landlord, specifying such failure and the amount due;

(b)  Breach.  Tenant's failure to keep, perform, or observe any of the covenants, agreements, terms, or provisions contained in this Lease that are to be kept or performed by Tenant other than with respect to payment of rent or other liquidated sums of money ("**Performance Breach**"), and Tenant's subsequent failure to take such steps as are necessary to remedy such Performance Breach within thirty (30) days after Tenant shall have been given a written notice thereof by Landlord (or within such longer period as may be commercially reasonable in the event a cure is impracticable within such thirty-day period and Tenant shall proceed diligently and with continuity to remedy the Performance Breach;

(c)  Noncompliance; Loss of Licensing.  Tenant's violation of any rules, laws and regulations of the OMMA regarding the growing, processing, distribution or sale of marijuana or the termination, revocation, suspension or material limitation, or non-renewal of Tenant's MM License or any other license required to be held by Tenant for its occupancy and ongoing use of the Leased Premises for the Permitted Uses;

(d)  Suspension.  Any other material suspension, termination or restriction

16

placed upon Tenant, its occupancy or use of the Leased Premises, or Tenant's ability to conduct its business operations, which has not been cured before the earlier of (i) closure of the Leased Premises or (ii) within sixty (60) days of the date of such suspension, termination or restriction; or

(e)    Insolvency.  Tenant's insolvency, its commission of any act of insolvency, or its inability generally to pay its debts as the same become due or the filing against Tenant of an involuntary petition for relief under any bankruptcy or insolvency law or under the reorganization provisions of any law of like import or for the appointment of a receiver of Tenant, or of all or substantially all of Tenant's property, which petition or appointment shall not have been discharged or stayed within sixty (60) days after issuance or Tenant's making of an assignment of its property for the benefit of creditors or Tenant's filing of a voluntary petition for relief under any bankruptcy or insolvency law, or any other law for the benefit of debtors and such petition shall not be discharged or withdrawn within thirty (30) days after its having been filed.

**11.2    Remedies**.  Upon the occurrence of an Event of Default, Landlord may exercise all rights and remedies under this Lease and the laws of the State of Oklahoma, where the Leased Premises are located that are available to a lessor of real and personal property in the event of a default by its lessee, and as to the Tenant's property, all remedies granted to a secured party the Oklahoma Uniform Commercial Code.  Landlord shall have no duty to mitigate damages unless required by applicable law and Landlord shall not be responsible or liable for any failure to re-let the Leased Premises or to collect any rent due upon any such re-letting.  Upon the occurrence of an Event of Default, Tenant shall pay Landlord, promptly upon demand, all reasonable expenses incurred by it in obtaining possession and re-letting any of the Leased Premises, including reasonable fees, commissions and costs of attorneys, architects, agents and brokers.  In addition, in the event of any breach or default by Tenant, Landlord may, but shall not be obligated to, immediately or at any time thereafter, and without notice, except as required herein, correct the underlying breach or default (without, however, curing the resulting Event of Default) for the account and at the expense of Tenant.  Any sum or sums so paid by Landlord, together with interest at the Default Rate, and all costs and damages shall be deemed to be Additional Rent hereunder immediately due and payable by Tenant to Landlord.

**11.4    Nonwaiver of Default**.    Landlord's subsequent acceptance of Base Rent, Additional Rent or any other sums due from Tenant under this Lease shall not be deemed a waiver of any preceding breach of any obligation by Tenant hereunder (other than Tenant's failure to pay the particular rental so accepted), and the waiver of any breach of any covenant or condition by Landlord shall not constitute a waiver of any other breach regardless of knowledge thereof.

**ARTICLE XII**
**Miscellaneous**

**13.1    Time of the Essence; *Force Majeure*.**  Time is of the essence in this Lease and all provisions hereof; provided that whenever a period of time is herein prescribed for action to be taken by Landlord or Tenant, Landlord or Tenant shall not be liable or responsible for, and there shall be excluded from the computation of any such period of time, any delays proximately

17

caused by unusually adverse weather conditions, fire, or other "acts of God", strikes, lockouts, acts of public enemy, riots or insurrections, ware, or any other unforeseen circumstances or events beyond the reasonable control of or the party whose performance is required ("***Force Majeure***").  *Force Majeure* shall, not however, include any circumstances or events or matters which may be resolved by the payment of money and may not be alleged as an excuse to suspend or abate any obligation of Tenant to pay Base Rent, Additional Rent or any other sums due from Tenant under this Lease.

     **13.2**   **Holding ●ver**.  Any holding over after the expiration of the Term, with the consent of Landlord, shall be construed to be a tenancy from month-to-month, and shall be on the terms and conditions herein specified, so far as applicable but Base Rent shall be equal to one hundred fifty percent (150%) of that payable at the expiration of this Lease.

     **13.3**   **Furniture and Fixtures**.  All furniture, fixtures and equipment placed in the Leased Premises by Tenant shall remain the property of Tenant, subject to the rights of Landlord as provided by law or this Lease.  Tenant may, at the expiration of the Term, remove such furniture, fixtures and equipment if removal is done so as not to damage the Leased Premises, provided that there are no current defaults in the obligations of Tenant under this Lease which would entitle Landlord to a lien on such furniture, fixtures and equipment.

     **13.4**   **Confidentiality**.  Tenant acknowledges that the terms and conditions of this Lease are to remain confidential for Landlord's benefit, and may not be disclosed by Tenant to anyone, by any manner or means, directly or indirectly, without Landlord's prior written consent; provided, however, Tenant may disclose the terms and conditions of this Lease if required by law or court order, and to its attorneys, accountants, employees and existing or prospective financial partners provided same are advised by Tenant of the confidential nature of such terms and conditions and agree to maintain the confidentiality thereof (in each case, prior to disclosure). Tenant shall be liable for any disclosures made in violation of this Section 13.4 by Tenant or by any entity or individual to whom the terms of and conditions of this Lease were disclosed or made available by Tenant. The consent by Landlord to any disclosures shall not be deemed to be a waiver on the part of Landlord of any prohibition against any future disclosure.

     **13.5**   **Rules and Regulations**.  Tenant and its members, managers, officers, employees, agents, representatives, guests and invitees shall observe faithfully and comply with any and all rules and regulations, if any, governing the Stilwell Facility and the Leased Premises, which may be prescribed from time to time by Landlord, in Landlord's sole discretion.  Landlord agrees to provide a copy of any rules and regulations to Tenant upon their adoption by Landlord, including any amendments or modifications thereto.  Upon receipt of such rules and regulations, or amendments or modifications, thereto, Tenant agrees to carry out, observe and comply with the same.

     **13.6**   **Limitation on Landlord's Liability**.  Tenant agrees that it shall look only to the Leased Premises in seeking to enforce any obligations or liabilities whatsoever of Landlord under this Lease or to satisfy a judgment (or any other charge, directive or order) of any kind against Landlord.  Landlord shall not look to the property or assets of any of the members, managers, officers, employees, agents or representatives of Landlord in seeking to enforce any

18

obligations or liabilities whatsoever of Landlord under this Lease or to satisfy a judgment (or any other charge, directive or order) of any kind against Landlord, and in no event shall any deficiency judgment be sought or obtained against Landlord. No person or legal entity who or which is a member, manager, officer, employee, agent or representative of Landlord shall be personally liable for any obligations or liabilities of Landlord under this Lease. Landlord shall in no event ever be liable for any punitive damages, consequential damages, special damages or business losses.

**13.7    Landlord's Performance of Tenant's Obligations**. The performance by Landlord of any obligation required of Tenant under this Lease shall not be construed to modify this Lease, nor shall it create any obligation on the part of Landlord with respect to any performance required of Tenant under this Lease, whether Landlord's performance was undertaken with the knowledge that Tenant was obligated to perform, or whether Landlord's performance was undertaken as a result of mistake or inadvertence.

**13.8    Relationship of Parties**. The relationship of the parties hereto is strictly that of Landlord and Tenant; Landlord has no ownership in Tenant's enterprise, and this Lease shall not be construed as a joint venture or partnership. Tenant is not and shall not be deemed to be agent or representative of Landlord.

**13.9    Notices**. All notices to be given hereunder shall be in writing, hand delivered or deposited in the United States mail, certified or registered, with postage prepaid, and addressed as follows:

> If to Landlord:    RB RealtyCo, LLC
> c/o Redbird Business Group LLC, Manager
> 1200 N. College
> Fayetteville, AR 72701
> Attn: William Thurman
>
> If to Tenant:    Mariteq Growers, LLC
> 471833 Highway 51 E
> Stilwell, OK 74960
> Attn: Steve Hockert

Notices shall be deemed delivered when personally delivered or when deposited in the United States mail, as above provided. Change of address by either party must be by notice to the other in the same manner as above specified.

**13.10    Captions**. The captions in this Lease are for convenience only and shall not in any way limit or be utilized to construe or interpret the terms and provisions hereof.

**13.1411    Jurisdiction, Venue, and Arbitration**. Any controversy or claim rising out of or related to this Lease (other than claims involving injunctive or equitable relief) shall be settled by binding arbitration before a single arbitrator in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any such controversy or claim shall be arbitrated on an individual basis and shall not be consolidated in any arbitration with any claim or controversy of any other party. Any arbitration shall be conducted in Tulsa, Oklahoma, and

19

shall be governed by Oklahoma law.  In the event of arbitration, the non-prevailing party shall bear all related costs, including the prevailing party's reasonable attorneys' fees as determine by the arbitrator. The parties agree that any court of competent jurisdiction may render judgment on or enforce any arbitration award. Neither party may receive any interim or preliminary relief, unless necessary to protects it rights or property pending the completion of arbitration, in a court of competent jurisdiction. All actions or proceedings arising from or related to this Agreement and for which a party seeks injunctive or equitable relief shall be brought only in a state court of competent subject matter jurisdiction in Adair County, Oklahoma, or in the United States District Court for the Eastern District of Oklahoma.  Each party expressly and irrevocably consents to personal jurisdiction and venue in such courts, and agrees to not object to such jurisdiction or venue on the ground of *forum non conveniens* or otherwise.

      **13.12  Binding Effect**.  All the terms, covenants and conditions hereof shall be binding upon and inure to the benefit of the respective heirs, executors, administrators, successors and assigns of the parties hereto; provided that nothing in this Section 13.12 shall be deemed to permit any assignment, subletting, occupancy or use contrary to any other provisions hereof.

      **13.13  Entire Agreement**.  This Lease and the covenants and conditions contained herein represent the full and complete agreement of the parties hereto, and neither this Lease, nor any of its provisions, may be modified except by a written instrument signed by both parties hereto.

      **13.14  Attorney Fees**.  In the event any dispute between the parties results in litigation to enforce the terms of this Lease, the prevailing party in litigation shall be entitled, in addition to all other remedies provided under this Lease or by law, to recover from the non-prevailing party any and all costs and expenses, including, without limitation, reasonable attorney fees.

      **13.15  Interpretation**.  In interpreting any provision of this Lease, no weight shall be given to nor shall any construction or interpretation be influence by the fact that counsel of one of the parties drafted this Lease, each party recognizing that it and its own counsel have had an opportunity to review this Lease, have contributed to the final form of this Lease.  Whenever action is to be taken (including the giving of notice or the delivery of documents) hereunder during a certain period of time or by a particular date that ends or occurs on a Saturday, Sunday or holiday in the State of Oklahoma, then such period or date shall be extended until the immediately following day that is not a Saturday, Sunday or such a holiday.  Whenever the words "*including*", "*include*" or "*includes*" are used in this Lease, they shall be interpreted in a non-exclusive manner as though the words "*without limitation*" immediately followed.

      **13.16  Authority**.  Landlord and Tenant have the legal right, power and authority to enter into this Lease. Each party's execution, delivery and performance of this Lease has been duly authorized, and no other action is requisite to the valid and binding execution, delivery and performance of this Lease, except as expressly set forth herein.

      **13.17  Cooperation.**  The parties acknowledge that the laws, regulations, and rules governing medical marijuana licenses issued by OMMA are subject to the imposition of unforeseen requirements upon the Tenant during the Term and any Renewal Terms of this Lease. In light of such uncertainty, Landlord agrees that during the Initial Term and any Renewal Terms

20

hereof, Landlord will provide reasonable assistance to Tenant in the maintenance of Tenant's MM License, including any renewal thereof.

**13.18**  **Counterparts.**  This Lease may be executed in one or more original, facsimile and/or ".PDF" counterparts, all of which shall be considered but one and the same agreement, and shall become effective when one or more such counterparts have been executed by each of the parties and delivered to the other parties hereto.

*[Remainder of this page left blank intentionally.  Signature page follows.]*

21

{00674359-5}

IN WITNESS WHEREOF, the Landlord and Tenant have executed this Lease as of the date and year first above written.

"Tenant"                                               "Landlord"

**MARITEQ GROWERS LLC**            **RB REALTYCO LLC**
an Oklahoma limited liability company

By _____

   Printed Name: _____

        Title: _____

By:  Redbird Business Group LLC
     a Delaware limited liability company
  Its:  Manager

  By: Redbird Ventures LLC
      an Oklahoma limited liability company
    Its:  Manager

    By _____
       Nimesh Patel,
       Director and Manager

    By _____
       William Thurman,
       Director and Manager

22

**Exhibit A**

**Description of the Real Estate**

The North 290.10 feet of the SE/4 of SE/4 of SE/4 of Section 26, Township 16 North, Range 25 East of the INDIAN BASE AND MERIDIAN, Adair County, Oklahoma

AND

The Hudson Block, an addition to the City of Stilwell, Oklahoma, also described as the W/2 of SE/4 of SE/4 and the South 369.35 feet of SE/4 of SE/4 of SE/4 of section 26, Township 16 North, Range 25 East, of the INDIAN BASE AND MERIDIAN, Adair County, Oklahoma.

AND

The NE/4 of SE/4 of SE/4 of Section 26, Township 16 North, Range 25 East, of the INDIAN BASE AND MERIDIAN, Adair County, Oklahoma.

{00674359-5}

**Exhibit B**

**The Leased Premises**

(*Floor Plan Attached*)

{00674359-5}



**Main Facility**
Growers:    50,274 SF
Processors: 7,890 SF

Common:    1,059 SF
Unrented:   1,462 SF
Total:       60,685 SF

25



Green House:
22,150 SF

{00674359-5}

**Little Bird** – Standalone Grow Facility

6,084 SF

